[S. F. No. 17227. In Bank. Feb. 11, 1947.]

Estate of WILLIAM GALVIN BUTLER, Deceased. ALICE GALVIN BUTLER et al., Appellants, v. WALTER C. COX, Respondent.

John B. Ehlen for Appellants.

Elkins & Wright and Leo A. Elkins for Respondent.

Robert E. Hatch as Amicus Curiae.

SPENCE, J. This is an appeal by the heirs from a decree of final distribution and from an order denying their motion to reopen the proceedings under section 1020.1 of the Probate Code. The challenged order is not appealable under section 1240 of the Probate Code and the appeal therefrom must be dismissed. However, the decree of final distribution disposed of all the matters contemplated by section 1020.1 of the code. The determination of the rightful heirs was made in accordance with the agreements of all the parties and the only point to be decided here is whether the probate court

should have refused to make distribution to respondent of a percentage interest in appellants' distributive shares in the estate. Respondent predicates his claim upon certain assignments and powers of attorney procured from appellants in pursuance of his business practice of soliciting beneficiaries of estates. Appellants attack the arrangements under which respondent assumed to act as contrary to public policy. Their objection to the validity of his claim is well taken under the facts of this case.

The decedent died intestate in San Francisco on March 16, 1942, leaving an estate of approximately $8,000. On March 20, 1942, the public administrator petitioned for letters of administration. On March 31, 1942, upon solicitation by respondent's foreign agent, certain of appellants, brother and sister of the decedent residing in Ireland, executed powers of attorney and assignments of one-third of their interests in the estate to respondent, who conducts a business of "probate research" in Chicago. On April 21, 1942, the other appellants, who were similarly solicited, executed like instruments in favor of respondent. Between May and September, 1942, all of appellants executed powers of attorney to Matthew Murphy, Irish Consul in San Francisco, and specifically revoked the powers granted to respondent. The consul promptly notified respondent of appellants' revocation and cancellation of the arrangements made with him, including the agreements for his compensation. Meanwhile, however, respondent had retained the services of local counsel, who on May 27, 1942, filed a notice of appearance in the estate on behalf of appellants. In March, 1944, the final account showing the estate ready for distribution was filed, and in December, 1944, the probate court determined that appellants (and certain minors who are not involved here) were the sole heirs and entitled to distribution. In January, 1945, appellants filed a motion under section 1020.1 of the Probate Code for distribution of their entire interest to them in disregard of the assignments to respondent, and a supplementary motion asking the court to inquire into the reasonableness of the consideration for the assignments. The motions were denied. Appellants subsequently filed a motion to reopen the proceedings on the ground that prior to the hearing of his petition for letters of administration—April 7, 1942—the public administrator had definite information available as to the names and addresses of decedent's brother and sister, as well as their counsel in Ire-

land, and hence appellants were not "lost or missing heirs." This motion was also denied and the decree of final distribution was made distributing one-third of appellants' shares in the estate to respondent.

The invalidity of respondent's claim stems from the nature of the agreements which he solicited from appellants, which agreements are typical of those used in his general practice of soliciting beneficiaries of decedents' estates. Operating from his principal office in the city of Chicago, respondent admittedly conducts his business in the following manner: by contacting and soliciting the heirs, securing their authorization to appear for them, and employing counsel to represent them under powers of attorney or assignments. Thus, as a nonlawyer acting for prospective beneficiaries under agreements providing for his paying "any and all expenses incident to the doing of the things he is authorized to do by said power of attorney, including attorneys' fees and court costs," respondent assumes complete control of litigation instituted on behalf of the beneficiaries through attorneys hired by him and becomes a "middleman" intervening for profit in the conduct of legal proceedings. Such procedure amounts to "commercial exploitation" of the legal profession and is contrary to public policy. (*Pacific Employers Ins. Co.* v. *Carpenter,* 10 Cal.App.2d 592, 595 [52 P.2d 992]; *Hightower* v. *Detroit Edison Co.,* 262 Mich. 1 [247 N.W. 97, 99, 86 A.L.R. 509].)

Pertinent to the consideration of the evil inherent in such heir-hunting system is the comparatively recent New York case of *In re Lynch's Estate* (1935), 154 Misc. 260 [276 N.Y.S. 939], wherein the general method of operation was similar to that here involved and the enterprise was condemned as constituting the unlawful practice of law contrary to the statute and public policy of the state. There the "heir-hunter" conducted a business under the trade name "Foreign Estate and Research Co." It was his custom to examine petitions in probate and administration as soon as filed for the purpose of ascertaining the names and addresses of legatees and beneficiaries in foreign countries. Through the information secured in that and other ways he solicited, through foreign correspondents, the prospective beneficiaries abroad of estates of decedents in this country and obtained powers of attorney. Thereupon he employed and paid local counsel to represent him in the administration of the estate,

the compensation fixed in the agreement with a foreign bene-
ficiary varying from ten to fifty per cent of the legacy or
intestate share. Observing that under such arrangements
"the services to be rendered by [the heir-hunter], aside from
the mere collection, contemplated the rendition of legal serv-
ices exclusively . . . [and] that the scheme of division of the
fees was an unlawful participation by him in the practice of
law," the court declared at page 945 that "the power of
attorney and the agreement of compensation [there] procured
. . . were illegal and void ab initio and in their entirety."
(See, also, *In re Wellington's Estate* (1935), 154 Misc. 271
[276 N.Y.S. 946]; 160 Misc. 386 [289 N.Y.S. 1005]; *In re
Vogelsang's Estate* (1937), 162 Misc. 257 [293 N.Y.S. 346];
*In re Tuthill* (1939), 256 App.Div. 539 [10 N.Y.S.2d 643].)

A similar question is involved in "ambulance chasing"
cases, where adjustors make contracts with injured persons
to take all the steps necessary to collect their claims, such
as employing attorneys and instituting suit. (*Townsend* v.
*State Bar,* 210 Cal. 362 [291 P. 837].) That practice has
been recognized as an evil (*Howe* v. *State Bar,* 212 Cal. 222
[298 P. 25]) and the courts therefore have been inclined to
hold the activities of those engaged therein as "practicing
law." (*Smallberg* v. *State Bar,* 212 Cal. 113 [297 P. 916].)

Respondent argues that section 1020.1 of the Pro-
bate Code recognizes the propriety of his business enterprise
in aid of an heir to recover his interest in an estate under
probate, and that his procedure therefore cannot be regarded
as contrary to public policy. But said section does not appear
to embrace the broad implications which respondent seeks to
assign to it. Rather, the section indicates simply the purpose
of the Legislature to give to the probate court, having but
special and restricted jurisdiction as prescribed by law, "some
control, at least for the purpose of distribution, over agree-
ments providing compensation for services of so-called 'heir-
hunters.' " (*Estate of Lund,* 65 Cal.App.2d 151, 153 [150
P.2d 211].) Prior to the enactment of section 1020.1 and
its forerunner, section 530.1 of the Probate Code, the probate
court did not have the power to determine the issue of the
validity of an assignment upon the distribution of an estate
(*Estate of Howe,* 161 Cal. 152 [118 P. 515]), upon inquiry
"into the circumstances surrounding the execution of such"
agreement and any accompanying instrument procured from
the prospective beneficiary. In the Lund case, *supra,* which

was an appeal on the judgment roll, the parties confined their dispute to the single point of the probate court's authority, after refusing to sustain the strict percentage terms of the heir's assignment, to recognize it to the extent of finding the reasonable value of the services performed thereunder and to decree distribution accordingly. Affirmance of the decree followed the express statement at page 156 that "no question has been raised concerning the validity generally of agreements providing compensation, by assignment or otherwise, for the services of so-called 'heir-hunters.' "

While in the *Estate of Cohen,* 66 Cal.App.2d 450, it was said at page 459 [152 P.2d 485] that upon enactment of the above-mentioned probate code sections "the Legislature of this state recognized the validity of so-called 'heir-hunter' contracts of the *type here involved"* (italics ours), such emphasis upon the factual considerations there present serves to distinguish the feature of impropriety in the premise of respondent's claim. In that case a certain genealogist (not a member of the legal profession) located the decedent's sister after an intensive search of two years, and she, in consideration of "his time, effort and expense in investigation and procuring proof of relationship," assigned to him thirty per cent of her share in the estate. No element of legal representation entered into the arrangement between the parties, either by execution of a power of attorney or other instrument. The assignment related wholly to compensation for genealogical services and the decree of distribution so recognized it. In rejecting the heir's argument, upon appeal, that the instrument should have been declared void as contrary to public policy, the court significantly said at page 456: "Sections 530 and 530.1 were added to the Probate Code as new sections in 1939, and in 1941 they were repealed and the substance thereof embodied in the enactment of section 1020.1 of said code. As enacted in 1939, sections 530 and 530.1 were evidently patterned after similar laws then existing in the State of New York; that being so, appellant contends that the decisions of that state are here controlling in the determination of the validity of the assignment in the present case. In this respect it appears that the statute of each state embodies the declaration that nothing contained therein shall be deemed to authorize the practice of law by an attorney in fact or other person acting under an instrument mentioned in the statute who is not a member of the bar of that state

. . . [but] there is nothing whatever contained in the instrument in question here which could be construed as authorizing or permitting respondent to select an attorney for appellant; and the evidence definitely shows that prior to and at the time of the execution of the assignment he not only informed those acting for appellant that he could not select a lawyer for her, but that he expressly refused so to do; furthermore the record shows that throughout the probate proceedings appellant was represented in and out of this state by attorneys of her own selection.''

▮ In striking contrast is the record in this case, where it appears that respondent, in pursuance of the powers of attorney executed, on his regular printed form by appellants, undertook ''to represent [them] in all proceedings whatsoever in the matter of the estate . . . and particularly . . . to petition for letters of administration or letters testamentary, to recognize, defend or contest wills . . . to institute, prosecute or defend suits and proceedings in law, equity or in probate, in any court or courts, to enter our and each of our appearances therein. . . .'' The respective assignments make express reference to the power of attorney ''this day executed,'' so that integrated in the consideration therefor is the parties' understanding that respondent would manage whatever legal proceedings were undertaken on behalf of appellants. This, in fact, respondent proceeded to do upon hiring local counsel to represent appellants in this estate. No evidence was offered by respondent as to any genealogical work or other activity required of him in locating appellants. The investigation report prepared for use of the public administrator in making his petition for letters of administration contained the notation that a certain local bank, where decedent had been employed, ''will notify heirs,'' so that it cannot reasonably he said that ascertainment of appellants' whereabouts would involve any problem of research for ''lost or missing'' heirs.

That respondent, through his foreign agent, *first* contacted appellants and notified them of their inheritance rights in the estate does not strengthen respondent's position. As appears from the record, agreements from some of appellants were procured only fifteen days after the death of the decedent and one week prior to the hearing of the petition for letters of administration; agreements from others of appellants were procured a short time thereafter. ▮ In the

absence of any evidence to the contrary, it must be presumed that the public administrator, in the discharge of his official duty in the handling of this estate, would have notified appellants on the basis of the information readily available to him as to their whereabouts. (Code Civ. Proc., § 1963, subd. 15.) Respondent's speedy solicitation of appellants, who may properly be regarded as ''known'' heirs, emphasizes the detrimental results typical of his general business practice, whereby beneficiaries, who would ordinarily receive their shares of estates in the usual course and without any deduction for attorney's fees or for the compensation of solicitors, may be imposed upon by foreign agents to make assignments of substantial percentages of their distributive shares in estates, and to execute accompanying powers of attorney. Such system of intermeddling for profit is not reconcilable with the policy of probate courts ''to protect beneficiaries of estates from imposition or unnecessary expense.'' (*In re Lynch's Estate, supra,* 276 N.Y.S. 939, 943.)

It is clear from the record that respondent has made it a business to furnish attorneys or counsel to render legal services to beneficiaries and that his solicitation of appellants contemplated only such procedure—a course of conduct wholly beyond the scope of the ''heir-hunter'' type of contract approved in the Estate of Cohen, *supra.* As noted in the above quotation from that case, our legislation on this subject, like the New York statutes upon which it was based, does not purport to validate any such arrangements by ''heir-hunters'' as are presented by the record here. The similarity of legislative treatment of this matter in the two states effectively demonstrates the pertinency of the New York decisions above cited. (*Ocean Acc. etc. Co.* v. *Industrial Acc. Com.,* 173 Cal. 313, 317 [159 P. 1041, L.R.A. 1917B 336]; *Fink* v. *Superior Court,* 105 Cal.App. 540, 542 [288 P. 124, 289 P. 209]. As a like factual situation was analyzed by the New York court, respondent's activities constituted the unlawful practice of law, and for that reason the assignments and powers of attorney under which he claims are illegal and void. (*In re Lynch's Estate, supra,* 276 N.Y.S. 939.) Manifestly, there is no similarity between the considerations involved here and those in the case of *Estate of Cazaurang,* 75 Cal.App.2d 217 [170 P.2d 694], where the assignments of certain percentage interests in the distributive share of an estate were executed by the claimant directly in favor of her attorneys,

and allowances made thereunder by the probate court were sustained as in accord with the findings of reasonable compensation for the legal services performed.

Nothing that is said herein is intended to cast doubt upon the validity of a power of attorney given to an unlicensed person who gratuitously performs services thereunder, including the employment of counsel for the principal at the principal's expense; and the question of the validity of an agreement to compensate an unlicensed person for that kind of service is not before us. Our decision is necessarily confined to the particular facts presented here, which admittedly show agreements for compensation and accompanying powers of attorney, obtained by an unlicensed person, under which he undertook to furnish legal services for his principals and to pay out of his agreed compensation "any and all expenses incident to the doing of the things he is authorized to do by said power of attorney, including attorneys' fees and court costs." Such is the nature of the undertakings which are here condemned as constituting the unlawful practice of the law and as contrary to the public policy of this state. (See *People* v. *Merchants Protective Corp.*, 189 Cal. 531, 538-539 [209 P. 363].)

Respondent argues that his enterprise operates on no different principle from a collection agency and that a contract whereby such agency has agreed to employ an attorney and prosecute the assigned claims in its own name has been upheld in this state as consistent with public policy. (*Cohn* v. *Thompson*, 128 Cal.App.Supp. 783 [16 P.2d 364].) But the cited case is distinguishable as the court there sustained the contract of the collection agency upon two grounds: first, that the collection agency, as the assignee, was the "real party in interest" and, as such, had the right to employ counsel to represent it, there being no agreement that the assignee would furnish "any legal services whatever to the assignor"; and second, that the statute adopted in 1927, defining and regulating collection agencies (Stats. 1927, ch. 485, p. 822), "declares the public policy as to such contracts" of collection agencies, and that therefore the courts may not declare such contracts to be contrary to public policy. Without pausing to discuss the first ground of the decision, upon which there is a conflict of authority (see 21 Cal.L.Rev. 616; 33 Cal.L.Rev. 622), we believe that the second ground of the decision clearly sustains the result reached in the cited case.

If doubt may have previously existed concerning the public policy of this state with respect to the ordinary contract of a collection agency, such doubt was dispelled by the enactment of the above mentioned statute in 1927. There is no similar statute, however, relating to "heir-hunters." ▮ Section 1020.1 does not mention "heir-hunters" and does not purport to define or regulate any particular business. While it does give the probate court some control, at least for the purpose of distribution, over assignments and agreements obtained by "heir-hunters" (*Estate of Lund, supra,* 65 Cal.App.2d 151, 153), this is true because it refers in general terms to "any assignee or transferee" and to "any person other than an heir, devisee, or legatee" who claims the right to distribution "pursuant to any agreement, request or instructions of any heir, devisee or legatee." Said section and its forerunner merely enlarged the powers of the probate court with respect to all such assignments and agreements, and neither said section nor its forerunner may be said to declare, expressly or impliedly, a public policy in favor of the validity of any assignment or agreement which was theretofore deemed contrary to public policy. The only matter of public policy which may be said to be declared by said section 1020.1 of the Probate Code is a policy to limit rather than to enlarge the rights of the holder of any such instrument.

The decree is reversed with directions to the probate court to distribute appellants' entire interests in the estate to them, in disregard of the assignments made to respondent. The appeal from the order denying the motion to reopen the proceedings is dismissed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Respondent's petition for a rehearing was denied March 10, 1947.