[Civ. No. 54877. Second Dist., Div. Four. Oct. 26, 1979.]

Estate of SHOLTS H. BOYD, Deceased.
HIRAM BOYD, Individually and as Administrator, etc., Petitioner and
Appellant, v.
JOSEPH A. BAKER et al., Objectors and Respondents.

■■■■■■■■■■■■■■■

COUNSEL

Lynn Snow and Charlotte Low for Petitioner and Appellant.

Leo Fenster for Objectors and Respondents.

OPINION

**ALARCON, J.**—We affirm the judgment of the probate court distributing property to the assignee of appellant, an heir of the estate of Sholts H. Boyd, deceased. In so doing, we hold that, in assessing the reasonableness of the consideration paid for an assignment of an interest in a probate estate, the lower court properly looked to the value of the estate interest on the date the assignment was made.

This appeal raises questions concerning the proper determination by a probate court, under Probate Code section 1020.1,[1] of the value of assigned property. The question presented appears to be one of first impression in California. Also challenged on appeal is the propriety of the court finding that the agreement in question was not the result of the imposition of undue influence on the assignor.

Probate Code section 1020.1 provides for judicial review of the merits of assignments transferring an interest in a probate estate. On the petition of any person interested in the estate, or on the court's own

---

[1]Probate Code section 1020.1 reads as follows: "The court before making distribution of any property of a decedent to any assignee or transferee of any heir, devisee or legatee or before making distribution to any person other than an heir, devisee, or legatee pursuant to any agreement, request or instructions of any heir, devisee or legatee or of any attorney-in-fact of any heir, devisee or legatee may on the motion of any person interested in the estate or on the motion of the public administrator or on its own motion inquire into the consideration for such assignment, transfer, agreement, request or instructions and into the amount of any fees, charges, or consideration paid or agreed to be paid by the heir, devisee or legatee and into the circumstances surrounding the execution of such assignment, transfer, agreement, request or instructions and if it finds that the fees, charges or consideration paid by any such heir, devisee or legatee is grossly unreasonable or that any such assignment, transfer, agreement, request or instructions was obtained by duress, fraud or undue influence it may refuse to make distribution pursuant thereto except upon such terms as it deems just and equitable. Notice of a hearing on any motion made pursuant to this section shall be served personally or by registered mail as the court may direct at least 10 days before the hearing upon the heir, devisee, or legatee executing any such assignment, transfer, agreement, request, or instructions and upon the person or persons claiming thereunder."

motion, the court may inquire into the consideration for the assignment, the amount of charges paid by the assignor, and the circumstances surrounding the execution of the assignment. If the court finds that the consideration is grossly unreasonable or that the assignment was obtained by duress, fraud, or undue influence, the court may refuse distribution, "except upon such terms as it deems just and equitable." (Prob. Code, § 1020.1.) In the instant case, appellant assignor contends that the consideration for the assignment was grossly unreasonable and that the assignment was obtained by undue influence. Therefore, appellant argues that under either theory the court order affirming the assignment must be reversed.

## Summary of the Facts

Sholts H. Boyd died testate on October 8, 1973. Decedent's will and codicil, executed in 1969, were admitted to probate. An inventory and appraisement of the estate filed in September 1974, showed assets in the approximate value of $150,000. Decedent's property consisted of cash, promissory notes, and seven parcels of income-producing real property in Venice, California.

Appellant, Hiram Boyd, was a nephew of decedent. Decedent's will specifically devised to him real property located at 548 Westminster Avenue, Venice, California. At the time of his uncle's death in October 1973, appellant was a resident of Texas. Upon learning that he, his brother, and his sister were mentioned in his uncle's will, he came to Los Angeles. He stayed in Los Angeles for approximately one month, at the end of which time he was informed that his mother was ill and in need of money. He testified that he attempted to get an advance from the money in the estate from the estate's attorney and that he contacted Cash for Heirs. Both attempts were unsuccessful. At that time, he was introduced to respondent, Joseph A. Baker, a real estate broker. Baker testified that he offered to buy the Venice real estate from appellant for $16,500. Appellant informed him that he was in urgent need of $3,000 immediately, and respondent agreed to open an escrow on condition that appellant receive $3,000 on opening of escrow and the balance of the purchase price when escrow was closed.

Sharon E. Martin testified that she was an escrow officer with Santa Monica Bank. On December 17, 1973, appellant and respondent came into her office and asked that she open escrow on the Venice property.

Respondent gave her verbal instructions concerning the documents to be prepared and handed her some written instructions. Mr. Boyd was present but did not speak during this transaction. She prepared escrow instructions and a grant deed and was given a copy of an assignment. All three documents were signed in her presence by Mr. Boyd and Mr. Baker.

Dr. Phillip Weise, a clinical psychologist, testified that he administered certain tests to appellant and concluded that he had the ability to read at the sixth-grade level. He evaluated the documents signed by appellant in this case and concluded that they required generally 10th to 12th grade level reading ability. He testified that he would estimate that appellant's IQ is in the bottom 25 percentile. Appellant testified that he did not read or attempt to read any of the documents concerning the sale of the property. They were handed to him, he was instructed to sign, and he did so.

With respect to the value of the property purchased, Edward Kraft testified on behalf of appellant. He is a real estate broker practicing in the West Los Angeles-Brentwood area. He estimated the value of the property on the date of the assignment in question at $26,000. He testified that on the date of hearing, March 29, 1977, the property was worth $51,500. Rodger Spero testified on behalf of respondent. He is a real estate broker with offices in Venice. He testified that at the time of the assignment, the property in question was worth approximately $16,000, give or take $1,000. The inheritance tax referee appraised the real property at $16,500.

■■■ *The Court Selected the Correct Valuation Date for Purposes of Assessing the Propriety of the Assignment.*

The trial court entered the following findings of fact: "That the market value of the real property devised to petitioner was, in December 1973, the time of the said agreement, $16,500,...

"That the consideration given the petitioner was not grossly unreasonable."

Appellant assumes, as do we, that although not expressly so stated, the court used the $16,500 valuation in reaching its conclusion that the consideration was not grossly unreasonable. Appellant contends that the court should have measured the adequacy of the consideration by com-

paring the purchase price with the value of the property on the date the estate was distributed.

The validity of Probate Code section 1020.1 is well established. (See, for example, *Burchell* v. *Strube* (1955) 43 Cal.2d 828, 836 [279 P.2d 1]; *Estate of McPherson* (1949) 94 Cal.App.2d 906, 909 [212 P.2d 41]; *Estate of Simmons* (1963) 217 Cal.App.2d 580, 586 [31 Cal.Rptr. 861].) ■ And the courts have recognized that the probate judge is empowered to give much stricter scrutiny to the fairness of consideration than would be the case under ordinary contract principles. (*Estate of Freeman* (1965) 238 Cal.App.2d 486, 488-489 [48 Cal.Rptr. 1].) ■ Appellant contends that the *Freeman* mandate that the court inquire into the reasonableness of "value received, in relation to the value given" (*id.* at p. 490) requires an assessment of the value of what the assignor gave up—the value of the property on the date of distribution.

In support of this contention, appellant relies on cases wherein devisees assign their right to take all of the residue of an estate. In those cases, the assignments were found void for lack of consideration based on the value of the residue of the estate as it became known after the assignment was executed. Appellant contends that those courts must have been using a later valuation date in order to provide full protection to the heir and to prevent dissipation of his assets. Appellant argues that the same principle applies to the bequest of a specific item of property to a legatee.

The fallacy in appellant's position as we see it does not concern any similarity or distinction between a single bequest and the residue of the estate. The problem lies in appellant's interpretation of the manner in which the court valued property in the cited cases.

In *Estate of Freeman, supra,* a residuary legatee died before the testator, and the gift of residue failed. The assignor, Katherine Freeman, was the decedent's sole heir at law. The residue of the estate consisted of stocks of a value of approximately $300,000. The right to those stocks was claimed by other legatees under the will pursuant to a paragraph which read: "I give and bequeath to Maebelle D. Traylor, of Palm Springs, California, all of my books, curios, tennis prizes and other personal property and effects not otherwise disposed of in this Will." (*Id.* at p. 487.) Katherine Freeman entered into an agreement with the Traylors to share their several interests in the estate, 40 percent to Miss Freeman and 60 percent to the Traylors. The probate court subsequent-

ly determined that the stocks passed under the residue clause of the will and that the Traylors were entitled only to tangible personal property. Miss Freeman petitioned under Probate Code section 1020.1 to set aside the agreement on the ground that it had been entered into for a grossly unreasonable consideration. The agreement was set aside and the Traylors appealed.

In upholding the lower court, the appellate court rejected the contention that the release of a claim advanced in good faith was valuable consideration. "Examining the merits of the various claims to the residuary estate, we find that the McGilvray claim was without genuine substance, because the specific bequest of the residue to one not related to the testator clearly lapsed when McGilvray predeceased the testator. (Prob. Code, § 92.) *Accordingly, Miss Freeman, the testator's sole heir, become entitled, to suceed to all the estate which would pass by intestate succession.*..[¶] Hence, as the probate court later found, Miss Freeman, the sole heir to a residuary estate worth $300,000, relinquished 60 percent of her inheritance to the Traylors in return for a minority interest in a nuisance-value claim. She gave up a share worth $180,000 in exchange for a share in a valueless legacy." *(Estate of Freeman, supra,* 238 Cal.App.2d at p. 490.) (Italics added.)

A distinction between *Freeman* and the case at bar is that in *Freeman*, at the time the devisee assigned away her interest in the estate, it was then worth $300,000, although she did not *know* it at the time. In the instant case, there is substantial evidence to support the court's finding that the property, at the time of the assignment, had a market value of $16,500. It was sold for $16,500. Appellant's complaint is not that at the time of the transfer he was *ignorant* of the true value of the property. His complaint, rather, is addressed to the unexpected and substantial increase in the value of that property between the time of the assignment and the time of the distribution of the estate.

Likewise, in *Estate of Plum* (1967) 255 Cal.App.2d 357 [63 Cal.Rptr. 241], husband signed an agreement waiving all rights in the estate of his deceased wife and giving them up to her children by a former marriage, in exchange for 15 percent of the total estate. Although he did not know it at the time, it was later discovered that all of her property was community property and thus he was entitled to take all of it by intestate succession. The *Plum* court found the consideration inadequate and refused to distribute property pursuant to the assignment. Again, this case is distinguishable from the case at bar; the character of

the property did not change between the time of the assignment and the time of distribution. At the time the assignment was executed, the assignor was giving up 100 percent of an estate for 15 percent of that estate. The unreasonableness of the contract is obvious.

Appellant relies on *Estate of Simmons, supra,* 217 Cal.App.2d 580. In that case, the court, in evaluating the reasonableness of consideration paid for an assignment of an interest in an estate, noted that expert testimony at the hearing established that the property was worth $4,950 some 10 years before the hearing, and $15,000 at the time of the hearing. Appellant's opening brief states: "The fact that there was no testimony as to the value of the property on the date of the assignment 'if error at all, was harmless,' the *Simmons* court said. It implied that the value of the property at the time of distribution was the relevant value to determine what consideration the heir was giving up." Appellant's point is not well taken. By omitting central facts from the quoted portion of the opinion, appellant has distorted the court's observation. The *Simmons* court said that the failure to find a value on the date of assignment was, if error at all, harmless, because no consideration was given for the assignment. "Petitioner also apparently argues that it was prejudicial error for the court to fail to make a finding as to the value of the subject property on the date of the alleged assignment. However, there is *no* evidence that the property was worthless, and there is abundant evidence that it had a substantial monetary value (despite the conflict over what this value was). Since the court *did* find that there was *no* consideration given for the purported assignment, it would seem that failure to find the precise value of the property at the time of that assignment, if error at all, was harmless. So long as the property had any substantial value at all, it cannot be said that a conclusion that the consideration was 'grossly unreasonable' is wrong where there was *no consideration at all.*" (*Estate of Simmons, supra,* 217 Cal.App.2d at p. 589.) (Italics in original.)

Appellant cites *Estate of Ramsey* (1951) 107 Cal.App.2d 372 [237 P.2d 20], for the proposition that the court must wait until the estate is ready for distribution before an evaluation of property can be made. "Clearly it is within the discretion of the court to conduct such hearings [on the validity of assignments] in advance as well as at the time of the hearing of a petition for distribution. However, in the present case, the hearing was had prior to the filing of any account by the executor, although it was necessary for the court to know the value of the interests

of appellants in the residuary estate in order to determine whether the sum they had received for their assignments was fair or grossly inadequate. We think that where interests have been assigned outright the court might properly refuse to conduct a hearing under section 1020.1 in advance of a hearing upon an account of the executor or administrator." (*Ramsey* at p. 375.)

The import of the holding in *Ramsey* is that the court must have some reliable foundation on which to base its evaluation of the property. Where no executor's account had been filed, the court "might properly refuse to conduct a hearing under section 1020.1 . . . ." In the instant case, the court had the benefit of the testimony of two experts and an inheritance tax appraiser concerning the value of the property.

Appellant cites *Estate of High* (1967) 250 Cal.App.2d 561, 567 [58 Cal.Rptr. 694], and *Estate of Bauer* (1943) 59 Cal.App.2d 152, 154 [138 P.2d 717], for the proposition that time of distribution is a correct valuation date in determining the validity of a charitable bequest. Appellant correctly cites the holding of those cases, but the analogy to the situation at bar does not withstand scrutiny. In those cases, the courts were required to determine whether a bequest to charity exceeded one-third of the total value of the estate. If so, and to the extent that it did, the bequest was void. Because of the necessity of deducting inheritance and estate taxes, and other charges of administration, before the "total value of the estate" could be determined, the relationship of the charitable bequest to the whole could not be properly evaluated prior to the time of distribution. No similar problems exist with respect to the value of a single bequest.

Therefore, there exists no authority for appellant's position that the trial court was required to analyze the agreement by comparing the value of the asset on the date of distribution with the sum paid for that asset on the date of the agreement. And such a requirement is unnecessary to afford to the heir the protection intended under the statute. This statute was originally enacted in order to give the court some control over agreements providing compensation for services of "heir hunters." (*Estate of Butler* (1947) 29 Cal.2d 644, 648 [177 P.2d 16, 171 A.L.R. 343]; *Fount-Wip, Inc.* v. *Golstein* (1972) 29 Cal.App.3d 751, 755-756 [105 Cal.Rptr. 780].) The statute has frequently been applied to contracts between such heir hunters and newly discovered heirs, wherein heirs have agreed to assign a fixed portion of their estates (often one-third) in exchange for the service of "being found" and

whatever oter services the heir hunter might render. In those cases, the heirs assignd an interest of unknown value in an estate about which they had nonformation. Often, it was clear that the heir would have been located y the estate administrators in due course. (See, for example, *Estate ojButler, supra,* 29 Cal.2d at pp. 647, 651.)

However, thisection has been found to apply to many types of agreements with heis, not just to those involving heir hunters. (*Estate of Simmons, supri* 217 Cal.App.2d at p. 586.) As explained in *Estate of Cohen* (1944) 6\ Cal.App.2d 450, 458 [152 P.2d 485]: "...by the enactment of Prbate Code section...1020.1 the Legislature has expressly authori;d and empowered probate courts to approve and enforce assignmentsof the type here under consideration, provided, of course, they are nt found to be tainted with fraud or with elements which would rende any contract void as being repugnant to good morals and against pulic policy;..."

Applying th legislative purposes (first, to control heir hunters and second, to authcize judicial inspection of assignments by heirs) to the principle at handthose purposes are fully served by requiring that the court scrutinize te agreement for fairness as of the date it was made. Judicial examintion of the agreement to evaluate its fairness as of the time of executiq will effectuate the intent of the statute. It will protect an heir from trasferring his property interest for grossly unreasonable consideration. (ee *Estate of McPherson, supra,* 94 Cal.App.2d at pp. 909-910.) The sttute, by allowing the court to determine adequacy of consideration, arves out an exception to the general rule that "...a court will not weıh the sufficiency of the consideration for a promise once it has founqit to be of some value." (*Estate of Freeman, supra,* 238 Cal.App.2d at )p. 488-489.) In enacting section 1020.1, the Legislature did not alter te rule that "[t]he sufficiency of a purported consideration for a contrac must be determined from the facts of the transaction as they existed ·hen the contract was made rather than by subsequent developments." (Long *Beach Drug Co.* v. *United Drug Co.* (1939) 13 Cal.2d 158, 165 ß8 P.2d 698, 89 P.2d 386].)

Transfers of property betwen heirs and third parties are conducted in such a way that the purchser of the asset exchanges money now based on present market value for the right to title and possession of the property when it is ultimatly distributed by the court. To require that the purchase price be incrased on the date of distribution if the

property value is then higher would remove much of the icentive for such contracts on the part of good-faith purchasers.

In the instant case, property whose market value wa $16,500 in 1973, was valued at $51,500 in 1977, at the time of disibution. The market price more than tripled during that period. If th law were as urged by appellant, a purchaser under the facts of this cse would have had to have paid $51,500 in 1973 for property whose thd market value was only $16,500 or, in the alternative, purchase the prerty at its present fair market value ($16,500) and then pay an additnal $35,000 at the time of the distribution of the estate. Few rationa'investors would enter into such a transaction.

Probate Code section 1020.1 was enacted to protect heirs from the consequences of unfair agreements. It was not ntended to relieve them of the effects of circumstances which changed fter the agreement was entered into. The Legislature authorized the court to determine whether the contract, at the time it was made, wa entered into as the result of duress, fraud, or undue influence, or in xchange for grossly unreasonable consideration. To the extent that th court is allowed to weigh the consideration paid, the statute reflects a modification of the general law of contracts for the benefit of heirs. Iothing in the statute indicates a legislative intent to modify the law oncerning the evaluation date to be utilized in appraising the fairnes of a contract. And as we have said earlier, we can see no purpose t be served by reading such a requirement into the statute. In interpreing statutes, courts are required to do so in a manner which will produe a reasonable, and not an absurd, result. (*Freedland* v. *Greco* (1955) 45 Cal.2d 462, 467 [289 P.2d 463].)

The heir, in assigning his right to an inteest in the estate, receives cash in hand although he cannot deliver te tangible asset assigned. Once the court has verified that the considration received by the assignor was fair at the time received, the deendant has had the benefit of all the protection the law provides.

We conclude that the court properly analyzed the agreement between the parties by comparing the consideratn paid by the assignee with the value of the property transferred by he assignor, at the time of the transfer. The subsequent increase in vaue of the real property transferred is a fortuity which does not affectthe fairness of the contract nor the reasonableness of the considerationpaid.

Because of our conclusion that the court properly evaluated the consideration for the assignment, we do not reach appellant's contention that the value of the property on the date of distribution should have included the value of accrued rental income.

■ *There Was Sufficient Evidence to Support the Court's Finding That the Assignment Was Not Obtained by Undue Influence*

Appellant contends that there was insufficient evidence to support the court's conclusion that the assignment was not the product of undue influence and overreaching on the part of respondent, and contends, rather, that "there was overwhelming evidence of the existence" of a grossly oppressive and unfair advantage of appellant. ■ "In weighing these claims we must view the evidence in the most favorable light to support the probate court's findings drawing every reasonable inference in their favor which the evidence will support. Probate Code, section 1020.1, lays the duty of determining...whether 'any such assignment, transfer (or) agreement...was obtained by duress, fraud or undue influence' upon the probate judge and we cannot substitute our judgment for his on the weight and effect of the evidence." (*Estate of Raphael* (1951) 103 Cal.App.2d 792, 795 [230 P.2d 436].)

■ Appellant contends that he did not understand that he was entering into a sale of probate property but thought that he was obtaining a loan against his interest in the estate. The evidence in the record is to the contrary. The appellant offered the following testimony in response to questions from the court:

"THE COURT: Well, what did you understand that you would finally get out of this piece of property which you were to receive from the will, from the estate?

"THE WITNESS: Well, I was under the impression that after the estate would close, that I was to receive—if we negotiate on completing the sale, that I was supposed to receive 13,000 some odd dollars.

"THE COURT: I see. [¶] You mean in addition to the three you were to receive some additional 13,000?

"THE WITNESS: Yes, sir.

"THE COURT: And Baker would receive your real property?

"THE WITNESS: Yes, sir."

Appellant also testified, on cross-examination, that shortly before the close of escrow, he looked at and selected a white Cadillac with a purchase price of $4,000. On the date escrow closed, he picked up a check for $10,000 from the escrow officer, and that afternoon spent $4,000 of that money to buy the car.

Appellant argues that he was unusually susceptible to overreaching on the part of respondent, that he did not understand documents that he was signing, and that the testimony of Phillip Weise demonstrates his limited comprehension. However, as previously noted, appellant apparently made no effort to read any of the documents before signing them. Thus, his ability to understand written material does not appear relevant. Further, the record indicates that appellant did in fact comprehend the nature and consequences of the transaction. During the latter part of the administration of the estate, appellant served as estate administrator. Stan Flinkman, attorney for the estate, testified that toward the close of escrow he was in contact with Mr. Boyd, who was anxious to get all documents and papers processed so that the sale could close. Mr. Flinkman testified as follows:

"Q. Now, is it your testimony at some point fairly close to the date of closing the escrow that you were then in communication with Mr. Hiram Boyd?

"A. Hiram was instrumental in getting things done so I can close the estate and that the escrow would close.

"Q. What do you mean he was instrumental?

"A. He was after Mattie and Leroy to get me all the figures necessary for an accounting so I could report to the court. [¶] He was instrumental in being in liaison with escrow as far as his own sale transaction to make sure it could close as soon as possible. [¶] He was very anxious apparently to get the money proceeds from the escrow.

"Q. You have said he was anxious. [¶] Did he in some way communicate to you something that would indicate that?

"A. Oh, yes. Everything he did was that. Including going to the escrow and signing and doing whatever was required by them in order to facilitate the closing of the transaction.

"Q. You have used the words 'sales escrow.' [¶] Did he in some manner to you indicate that it was a sale?

"A. Oh, yes.

"Q. What did he say to you?

"A. That there was never any question in that both the assignment and the subsequent escrow instructions refer to a sale and that he wouldn't—the sale would not be completed until probate closed. And it had to be closed in order for the sale escrow to be completed."

There is more than sufficient evidence to support the ruling of the probate court that the assignment was not the product of fraud, duress, overreaching or undue influence. ■ As stated in *Estate of McPherson, supra,* 94 Cal.App.2d at page 909: "Counsel for appellant devote many pages of their briefs to argument as to the weight, value, and effect of the testimony. The power of this court begins and ends with the determination from an examination of the record that there is substantial evidence to support the order."

The order is affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied November 20, 1979, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied December 20, 1979.