[No. B197196. Second Dist., Div. Three. Aug. 1, 2008.]

Estate of GUADALUPE MOLINO, Deceased.
JEFFREY SIEGEL, Petitioner, v.
CONNIE BOLDT et al., Objectors and Respondents;
KEVIN O'GRADY, Claimant and Appellant.

**COUNSEL**

Jayne T. Kaplan for Claimant and Appellant.

No appearance for Petitioner.

Donald L. Scoggins for Objectors and Respondents.

**OPINION**

**ALDRICH, J.—**

I.

INTRODUCTION

Appellant Kevin O'Grady asserts he has valid assignments entitling him to a percentage of the inheritance of respondents Connie Boldt, Frank

Hernandez, and Ignacio Hernandez. Respondents are the half siblings of deceased Guadalupe Molino (deceased).[1]

O'Grady appeals from a summary judgment rendered by the probate court holding that the assignments are not enforceable because they are void. We affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The initial facts*

On June 30, 1995, deceased executed her last will. She left $100,000 to her longtime friend, Seymour Cohen (Cohen), and divided the residue equally among her five half siblings, including respondents.[2] Deceased's two brothers, Ignacio and Frank, were appointed executors. The month deceased executed her 1995 will, she gave Ignacio her car. She had been having regular telephone contact with Ignacio. Deceased also wrote him letters.

In February 1997, deceased was hospitalized. Cohen filed a petition seeking to become deceased's conservator. He represented to the probate court that deceased had no living relatives. Cohen attached to his petition a 1990 will stating that deceased's "nearest relatives [were] four children of [her] deceased brother . . . ." In the 1990 will, 25 percent of deceased's property was left to Cohen's children and the rest to various charities.

In 1997, Jeffrey Siegel (Siegel) also sought to be appointed as deceased's conservator. Siegel relied on the 1990 will to represent to the probate court that deceased had no known spouse, children, grandchildren, or siblings. This representation was consistent with a statement made by Cohen's attorney.

O'Grady is a California-licensed private investigator. According to O'Grady, he and Siegel only knew about the 1990 will. In February 1997,

---

[1] For ease of reference and when necessary, respondents are referred to by their first names. Connie is also known as Concepcion Boldt.

[2] The fourth sibling is Margie Hopton. The fifth sibling is Virginia Villanueva.

Siegel and O'Grady searched deceased's home. In the search, no other will was located. Siegel asked O'Grady to locate deceased's living relatives.

Thereafter, O'Grady located respondents in Arizona.[3] Respondents are the half siblings of deceased.

### 2. *The assignment*

When O'Grady located respondents, he informed them that immediate action was required to prevent deceased's finances from being squandered by Cohen. O'Grady told respondents that it was vital that Siegel be appointed conservator and that legal action be taken to protect deceased's estate for her blood relatives. O'Grady asked respondents to return to him a document nominating Siegel as conservator and additionally to sign an agreement that would give him 35 percent of any distribution that respondents might receive.

In a letter directed to Ignacio, O'Grady stated: "[Deceased] is now in a [convalescent] hospital unable to care for herself. Awhile ago she signed a will giving over her entire estate to a friend of her's. . . . I have seen this situation many times where an elderly person has been taken advantage of by an acquaintance . . . . [The friend has stolen from deceased.] [¶] What you need to do is appoint Jeff Siegel, who is a professional conservator, as [deceased's] conservator . . . . I have enclosed a nomination form which you can sign and return to me. [¶] We will then begin the legal action against [deceased's] current will to get distribution of her estate to her blood relatives. [¶] This legal action is involved and costly. I have enclosed [an] Agreement [whereby] if we are successful in [challenging] the will we will receive 35% of any distribution you and your brothers and sisters may receive. [¶] As it states in the Agreement, [w]e will pay for all of the legal costs in [challenging] the will. This means that it will not cost you and your family one cent. This is especially important if we are not successful in challenging the will."

In May 1997, each respondent signed an "assignment & agreement" (hereinafter the May 1997 agreements) agreeing to pay O'Grady 35 percent of any assets to which they might be entitled.

The May 1997 agreements read in part: "I understand that Kevin O'Grady has located assets that may belong to me. At no risk or expense to myself, I

---

[3] O'Grady located Margie Hopton and Virginia Villanueva in Sacramento, California.

appoint Kevin O'Grady as my agent and authorize him to act on my behalf in attempting to obtain such assets. . . . [¶] Kevin O'Grady shall be compensated only if he is successful in recovering any assets for me. I agree and assign thirty-five percent (35%) of the recovered asset[s] to Kevin O'Grady. Kevin O'Grady will pay for all ordinary attorney fees, for the attorney of his choice, incurred in the recovery of the assets. [¶] . . . If [Kevin O'Grady's] efforts are successful I understand that I will receive a check in the amount that I am due, less the percentage stated above. If his efforts are unsuccessful and should I be advised by Kevin O'Grady that he has made all reasonable efforts to protect my claim, I shall be under no further obligation."[4]

It appears respondents signed the nomination of conservator forms and returned them to O'Grady. Siegel was appointed deceased's conservator.

On June 23, 1997, Siegel, as deceased's conservator, paid O'Grady $1,750 for his "investigator's fee for locating relatives." This sum was reported on Siegel's verified first account and report. The probate court approved the accounting on February 19, 1998.

In 1999, respondents hired Arizona counsel to investigate the facts surrounding a petition regarding placement and medication for deceased.

### 3. Deceased's death and the initial order of distribution

Deceased died on April 4, 2005. She left an estate valued at approximately $1.1 million.[5] In March 2005, two weeks before deceased died, O'Grady contacted Frank and told him that to protect his interest in deceased's estate, he must nominate Siegel to serve as administrator of deceased's estate. It appears O'Grady made the same request to Ignacio.

Apparently Frank and Ignacio signed nomination of administrator forms so Siegel could be appointed administrator of deceased's estate. Respondents represent that Siegel was appointed administrator of deceased's estate on May 25, 2005.

---

[4] Ignacio signed this agreement on May 14, 1997. Frank and Connie signed virtually identical agreements on May 27, 1997, and May 29, 1997, respectively.

[5] The appellate record shows that the estate was worth more than $1.1 million. According to respondents, deceased's estate was valued at approximately $1.8 million, making each half sibling's share worth approximately $360,000.

From 1997 to 2006, O'Grady preserved testimony from relatives in anticipation of a will contest.

On February 6, 2006, Siegel filed a petition for preliminary distribution. He did not mention the May 1997 agreements.

On March 23, 2006, Siegel distributed $280,000 to O'Grady. (According to respondents, this sum was apparently ascertained by taking 35 percent of $200,000 ($70,000) and multiplying that sum by four, once for each respondent and once for their sibling, nonparty Virginia Villanueva. It appears that the fifth sibling, Margie Hopton, was not considered in this calculation.)

The distribution to O'Grady was made two weeks before the probate court executed an order for preliminary distribution on April 13, 2006. In the April 13, 2006 order, Siegel was directed to distribute $200,000 to each respondent. The distribution order did *not* direct any sums be distributed to O'Grady.

Siegel wrote checks in the sum of $130,000 ($200,000 less $70,000) to each respondent. Siegel instructed O'Grady not to release the $130,000 to each respondent until each had executed receipts showing that they had received $200,000. O'Grady wrote to respondents, instructing them to sign a receipt showing that they had received $200,000. The letters stated that O'Grady would release $130,000 to them once the receipts were signed and returned to him. Frank and Ignacio accepted the $130,000 and signed the receipts. Connie refused to sign the receipt, and O'Grady refused to give Connie her $130,000 check.

4. *Respondents' petition to remove Siegel and respondents' summary judgment motion to invalidate the May 1997 agreements*

Respondents hired counsel and in May 2006, filed a petition with the probate court seeking to have Siegel removed as deceased's personal representative.

On May 12, 2006, Siegel filed a petition pursuant to Probate Code section 11604, seeking a determination as to whether the May 1997 agreements were

valid assignments. Although Siegel stated he was not taking a position as to the validity of the May 1997 agreements, he also stated that the documents "appear to be standard agreements typically signed by beneficiaries in favor of heir hunters."

O'Grady filed a response to Siegel's petition. (Prob. Code, § 11604.)[6] O'Grady urged the probate court to find that the May 1997 agreements were legitimate assignments obtained in his capacity as an heir finder.

On June 30, 2006, the probate court suspended Siegel's powers as representative of deceased's estate.

Respondents objected to Siegel's petition and urged the probate court to find that O'Grady was not entitled to a percentage of their shares of the estate. Respondents argued that the May 1997 agreements were not valid assignments and were not enforceable. They asserted (1) there was no consideration for the May 1997 agreements; (2) O'Grady already had been compensated for his services; and (3) the May 1997 agreements were void as against public policy.

Respondents also filed a motion for summary judgment contending that the May 1997 agreements were not valid assignments. They reiterated the arguments they had presented in opposing Siegel's petition.

The trial court granted respondents' summary judgment. On February 22, 2007, the probate court entered a summary judgment holding that the "assignments entered into between Kevin O'Grady and [respondents] and each of them, are void. [¶] [Respondents] are entitled to receive distribution of all of their shares of the estate; Kevin O'Grady is not entitled to any

---

[6] Probate Code section 11604 reads in part:

"(b) The court on its own motion, or on motion of the personal representative or other interested person or of the public administrator, may inquire into the circumstances surrounding the execution of, and the consideration for, the transfer, agreement, request, or instructions, and the amount of any fees, charges, or consideration paid or agreed to be paid by the beneficiary.

"(c) The court may refuse to order distribution, or may order distribution on any terms that the court deems just and equitable, if the court finds either of the following:

"(1) The fees, charges, or consideration paid or agreed to be paid by a beneficiary are grossly unreasonable.

"(2) The transfer, agreement, request, or instructions were obtained by duress, fraud, or undue influence."

portion of the shares of [respondents]."[7] This appeal by O'Grady followed. Siegel has not appeared on appeal.[8]

## III.

## DISCUSSION

A. *Standard of review.*

Summary judgment is properly granted where there are no triable issues of fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the court's decision granting a summary judgment de novo. In doing so, we liberally construe all conflicting facts in the light most favorable to the party opposing the motion. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517]; *Pacific Shore Funding v. Lozo* (2006) 138 Cal.App.4th 1342, 1348–1349 [42 Cal.Rptr.3d 283]; *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1520 [80 Cal.Rptr.2d 94].)

B. *The May 1997 agreements are not enforceable assignments because they are void as against public policy.*

O'Grady claims there are triable issues of fact as to whether the May 1997 agreements are enforceable assignments, and thus the trial court has erred in granting summary judgment. We disagree. Based upon the undisputed facts, the 1997 agreements are void as against public policy and thus are not enforceable.

██ "A beneficiary may assign or otherwise transfer his or her interest in an estate prior to distribution. [Citations.]" (Gold et al., Cal. Civil Practice: Probate and Trust Proceedings (2005) § 3:86, p. 3-78.) Thus, heirs may agree by contract to pay a percentage of their shares of an estate to an heir hunter who has located the heir. However, the probate court has the authority to examine such contracts, and the circumstances surrounding their execution, to determine the reasonableness of the consideration and to assure that the contracts were not obtained by duress, fraud, or undue influence. (Prob. Code, § 11604; *Estate of Wright* (2001) 90 Cal.App.4th 228, 234 [108 Cal.Rptr.2d 572] (*Wright*); see fn. 6, *ante*; see generally 14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 723, p. 809; Gold et al., Cal. Civil

---

[7] Respondents represent that after the summary judgment was granted, Connie received $130,000.

[8] Apparently Margie Hopton predeceased deceased and Hopton's children received their mother's share of deceased's property. Neither Hopton's heirs nor the fifth sibling, Virginia Villanueva, appear as parties to this appeal.

Practice: Probate and Trust Proceedings, *supra*, § 3:86, p. 3-78 et seq.) The probate court may refuse to distribute any sum to the heir hunter, refuse to order distribution, or modify the distribution on any terms it deems just and equitable. (Prob. Code, § 11604; *Wright, supra*, at p. 239.)

■ However, heir hunting contracts are not valid if they violate statutes or public policy.

For example, an heir hunting contract drawn by an heir hunter that obligates heirs to execute powers of attorney in favor of the attorney hired by the heir hunter may violate the statutory prohibition against running and capping. (*Wright, supra*, 90 Cal.App.4th at p. 235; Bus. & Prof. Code, § 6152, subd. (a)(1) [unlawful for person to act as runner or capper or to solicit business for an attorney]; Rules Prof. Conduct, rule 1-400 [prohibiting solicitation].)

Such contracts may also violate public policy. *Estate of Butler* (1947) 29 Cal.2d 644 [177 P.2d 16] (*Butler*) is an example of a situation in which an heir hunting contract is void because it violates public policy. *Butler* held that when an heir hunter contracts to obtain counsel and to prosecute heirs' claims, the contract constitutes the illegal practice of law and is void. (*Id.* at p. 647; see also *Estate of Collins* (1968) 268 Cal.App.2d 86, 91 [73 Cal.Rptr. 599].)

In *Butler, supra*, 29 Cal.2d 644, an heir hunter conducted a business whereby he would locate heirs and solicit from them an agreement to pay him a percentage of the heirs' inheritance. (*Id.* at p. 647.) The heir hunter would obtain signed agreements from the heirs "securing their authorization to appear for them, and employing counsel to represent them under powers of attorney or assignments. Thus, as a nonlawyer acting for prospective beneficiaries under agreements providing for his paying 'any and all expenses incident to the doing of the things he is authorized to do by said power of attorney, including attorneys' fees and court costs,' [he assumed] complete control of litigation instituted on behalf of the beneficiaries through attorneys hired by him and [became] a 'middleman' intervening for profit in the conduct of legal proceedings." (*Ibid.*) Butler held "[s]uch procedure amounts to 'commercial exploitation' of the legal profession and is contrary to public policy." (*Ibid.*; see also Bus. & Prof. Code, § 6125 ["No person shall practice law in California unless the person is an active member of the State Bar."].) The contract was void as against public policy because it was an illegal contract.

In contrast, in *Wright, supra*, 90 Cal.App.4th 228, the court held there was no violation of public policy. In *Wright*, an heir hunting contract gave the heir

hunter a percentage of the heir's inheritance and a limited power to obtain documents relating to the heir's identity and the identity of the heir's parents. The contract did not grant the heir hunter the power to represent the heir or control the litigation. (*Id.* at p. 235.) Thus, the contract did not constitute the unlawful practice of law. (*Ibid.*) The contract in *Wright* was an agreement to pay the heir hunter solely for genealogical services and therefore did not violate public policy. (*Ibid.*)

Thus, if an heir hunter obtains an assignment authorizing the heir hunter to select and pay for an attorney and there is an element of legal representation included in the heir hunting contract or assignment, such as controlling the litigation, the agreement is void as against public policy. (*Estate of Collins, supra,* 268 Cal.App.2d at p. 90.) That is what occurred here.

Before signing the May 1997 agreements, O'Grady told respondents the following: He and Siegel would "begin the legal action" required to obtain their share of deceased's estate; "[the] legal action is involved and costly"; and "[w]e will pay for all of the legal costs in challenging the will." The May 1997 agreements gave O'Grady the power to select an attorney of his choice and O'Grady was obligated to pay all attorney fees. Thus, the May 1997 agreements, consistent with the promises O'Grady made to respondents before the agreements were executed, gave the power to retain counsel and control the litigation to O'Grady. Therefore, the agreements were void as against public policy. The fact that the May 1997 agreements empowered O'Grady to employ counsel and did not require O'Grady to act himself as the attorney did not take the case out of the rule established in *Butler.* (*Estate of Larson* (1949) 92 Cal.App.2d 267, 273 [206 P.2d 852] ["The fact that the [heir hunter's] agreement may be to employ counsel and not to act himself as a lawyer does not take the case out of the [*Butler*] rule."].) O'Grady acted consistently with the powers given to him because from 1997 to 2006 he preserved testimony of witnesses in the event of a will contest. As such, the May 1997 agreements were not valid assignments as they were void as against public policy.

To avoid the application of the law enunciated in *Butler* and *Wright,* O'Grady points to another part of the *Wright* opinion. In *Wright, supra,* 90 Cal.App.4th 228, the heir signed the document delineated above and *additionally* signed a separate power of attorney in favor of Attorney John Boessenecker authorizing Boessenecker " 'to exercise or perform any act, power, duty, right or obligation whatsoever that [the heir] now [has] or may hereafter acquire . . . .' " (*Id.* at pp. 232–233.) Later, the heir refused to sign an agreement authorizing Boessenecker to represent her in probate. This refusal constituted a revocation of the power of attorney. (*Id.* at p. 233.) The

heir hired another attorney to represent her in the probate proceedings. As discussed above, *Wright* upheld the heir hunting contract. It noted, however, that "[t]he result . . . may have been different had the heir hunter succeeded in inducing [the heir] to employ Boessenecker as her attorney. In such event, all the documents may have been so inextricably tied to one other that the taint of Boessencker's power of attorney may have rendered them all void for reasons of public policy. But [the heir] revoked the power of attorney and employed independent counsel. The situation thus differs from *Butler* and does not require invalidation of the assignment." (*Id.* at p. 236.)

O'Grady argues that the situation before us is similar to the discussion in *Wright* relating to the hiring of Boessenecker. O'Grady states that he never hired an attorney for respondents but rather, respondents hired their own attorney. However, by this argument O'Grady ignores the contents of the May 1997 agreements and the sequence of events.

First, the May 1997 agreements *included* provisions granting O'Grady the right to hire counsel and control any litigation and thus, went beyond simply compensating O'Grady for his genealogical services. In contrast, in *Wright*, the heir hunting contract was limited to finding heirs; the power of attorney granted to Boessenecker was in a separate document. Second, in *Wright*, the heir hired her own attorney prior to the probate court establishing and protecting her right to inherit. Here, respondents hired California counsel only after the probate court had issued a preliminary order recognizing respondents' rights to share in the estate and authorizing Siegel to distribute to respondents $200,000. In 1999, when respondents hired counsel, they hired an attorney in Arizona six years before deceased had died. The Arizona counsel was not hired by respondents to secure their rights to their share of deceased's estate, but to investigate a petition regarding placement and medication for deceased.

The May 1997 agreements are not enforceable assignments.

### C. *O'Grady may not rely on ratification or laches to enforce the May 1997 agreements.*

O'Grady contends that respondents ratified the May 1997 agreements and also that laches precludes respondents from denying that they are enforceable. These contentions are not persuasive.

■ First, O'Grady did not raise ratification or laches in his response to the petition. Thus, he is precluded from raising these defenses in opposition to respondents' motion for summary judgment. (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98–99, fn. 4 [93 Cal.Rptr.2d

820] [motion for summary judgment cannot be defeated on issues not raised in the pleadings]; *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 382–383 [282 Cal.Rptr. 508] [same].)

■ Additionally, respondents may not ratify void contracts. "Void promises are not legally binding, have no legal effect, and, therefore, are not contracts." (1 Williston on Contracts (4th ed. 2007) § 1:20, p. 73, fn. omitted.) "[I]f a bargain violates public policy, it is void and of no legal effect." (*Id.* at p. 75, fn. omitted.) Void contracts cannot be ratified. (*Fewel & Dawes, Inc. v. Pratt* (1941) 17 Cal.2d 85, 91 [109 P.2d 650]; *Russell v. Soldinger* (1976) 59 Cal.App.3d 633, 644–646 [131 Cal.Rptr. 145]; *Industrial Indem. Co. v. Golden State Co.* (1953) 117 Cal.App.2d 519, 540 [256 P.2d 677]; Civ. Code, § 1667.)

With regard to laches, O'Grady states that respondents waited nine years (from May 1997 to May 2006) to rescind the agreements, notes that laches is usually a question of fact, and then argues summary judgment cannot be granted to respondents because there are questions of fact with regard to whether laches precludes respondents from addressing the enforceability of the May 1997 agreements.

■ However, to assert laches, O'Grady must show that respondents unreasonably delayed bringing their summary judgment motion to void the May 1997 agreements and such delay prejudiced O'Grady. (Civ. Code, § 3527; *Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1417–1418 [128 Cal.Rptr.2d 31]; *In re Marriage of Plescia* (1997) 59 Cal.App.4th 252, 256 [69 Cal.Rptr.2d 120].) As a matter of law, O'Grady cannot do so. The validity of the May 1997 agreements was to be determined at the time of distribution. (Prob. Code, § 11604, subd. (b).) Neither O'Grady nor Siegel brought to the probate court's attention the existence of the May 1997 agreements, suggesting they wished to hide this fact from the probate court. This is the only conclusion that can be drawn from the fact that O'Grady asked respondents to sign receipts stating they had received $200,000 (the amount the probate court ordered to be distributed to them), when in fact respondents were to be paid $130,000. It was only when O'Grady presented the receipts to respondents that they became aware of the fact that O'Grady was seeking to enforce the May 1997 agreements. At that time, respondents acted quickly and without delay to bring the agreements to the attention of the probate court. The critical date is when respondents learned that O'Grady was attempting to assert the validity of the assignments. Prior to that time, there was no reason to address the validity of the assignments. Further, O'Grady has not presented any facts to show he was harmed by any purported delay.[9]

---

[9] In light of our holdings, we need not discuss respondents' alternative arguments, including that the May 1997 documents lacked consideration.

## IV.

## DISPOSITION

The judgment is affirmed. O'Grady is to bear all costs on appeal.

Croskey, Acting P. J., and Kitching, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 28, 2008, S166360.