[No. 61932-8.   En Banc.   June 22, 1995.]

MAYNARD NELSON, *Respondent*, v. MARY M. McGOLDRICK, *Petitioner*.

*John C. Moore (of Bonneville, Viert, Morton & McGoldrick),* for petitioner.

*Horton Smith* and *Harish Bharti* (of *Felix, Zimmar & Smith*), for respondent.

MADSEN, J. — Petitioner Mary McGoldrick challenges the legality and enforceability of a contract obligating her to pay an "heir hunter" 50 percent of the value of property which she is entitled to inherit in exchange for assistance in recovering the property. The trial court granted summary judgment in favor of McGoldrick, holding that the contract is unconscionable and void, and dismissed Respondent Maynard Nelson's action seeking payment under it. The Court of Appeals reversed, finding no unconscionability, but remanded on the issue of whether Nelson

performed under the contract. We reverse the Court of Appeals, but also remand because summary judgment on the issue of unconscionability was erroneous on this record.

## FACTS

Mary McGoldrick is the widow of Richard Hodge, who died in 1971. Mr. Hodge was the owner of record of 500 shares of stock in Panorama City, Inc. Maynard Nelson is in the business of tracing missing heirs, doing business under the name Pacific Equities. Nelson solicits business in various ways, including the use of newspaper advertisements which seek the whereabouts of particular people. Panorama placed such an advertisement seeking Mr. Hodge some time in early July 1987. As a result of this advertisement, and with the help of an assistant, Nelson eventually learned that Panorama was trying to locate Mr. Hodge regarding his stock holdings. As a result of a stock exchange, Mr. Hodge was entitled to property valued at approximately $50,000.

Nelson also learned that Hodge had died, and that Mary McGoldrick was entitled to the property. After locating McGoldrick, Nelson telephoned her on July 29, 1987, telling her he knew of property due her. But he refused to describe the property, stating "she'd beat me on my fee". Clerk's Papers, at 55. Later that day he met with McGoldrick and her husband, a real estate broker. During the meeting, McGoldrick's stepson, attorney David McGoldrick, arrived at her request to advise her. Nelson refused to give any information at the meeting which would enable Mary McGoldrick to locate the property. He agreed, however, to provide information about the location and nature of the property if she promised to give him half. Mary McGoldrick signed the following agreement on July 29, 1987:

> In consideration of your successful efforts to notify me of unclaimed assets to which I (claimant) may be entitled, and your promise to direct my claim into proper channels, I

hereby assign to you (finder) one-half of the net collection. It is understood: 1. Claimant will cooperate by executing documents needed to complete the claim; 2. Unless a collection is made there will be no charge to claimant whatsoever.

Clerk's Papers, at 3. One document to which McGoldrick agreed, but failed to execute, according to Nelson, was a power of attorney.

After securing the agreement, Nelson turned the matter over to his attorney, who contacted Panorama. Panorama sent materials on July 30, 1987. When no claim was made, Panorama sent Nelson's attorney a letter dated October 22, 1987, reminding him to complete the transaction. There was no response.

Eventually, David McGoldrick contacted Nelson's attorney and learned that the property in question involved stock in Panorama. Attorney McGoldrick then contacted Panorama. By letter dated February 3, 1988, Panorama requested proof that McGoldrick was representing the heirs of Mr. Hodge. McGoldrick ultimately processed the claim for Mary McGoldrick and Nelson's attorney had no further involvement.

Mary McGoldrick did not pay Nelson and he filed suit, seeking enforcement of the agreement. McGoldrick moved for summary judgment, claiming that the contract was unconscionable, illegal, and against public policy. The trial court granted the motion on the grounds that the contract was unconscionable, and dismissed Nelson's claims with prejudice. He appealed.

In a split decision, the Court of Appeals reversed and remanded for trial on the issue of whether Nelson performed his obligations under the contract. McGoldrick then petitioned for review, which was granted. Nelson filed a supplemental brief, which McGoldrick has moved be stricken. The motion to strike was passed to the merits.

This is a case of first impression in Washington. Although not mentioned by the parties, there is a significant body of law relating to heir hunting.

The business or profession known as "heir-hunting" or "heir-chasing" has a checkered and interesting history, having long been established on an international and local basis as a lucrative means of livelihood. "Probate searchers" usually operate by investigating probate or surrogate court records to uncover estates of substantial wealth whose probate or administration has been delayed because of inability to contact one or more of the missing heirs. An investigator, usually unknown to the estate, locates the missing heir through court records and genealogical information collected by his staff, and at times through cooperation with foreign agents in the same business. The missing person is hastily informed that he has a valid claim as an heir against an unsettled estate. He is promised genealogical charts and other information with which he can establish his heirship if he will assign a portion of his inheritance to the probate searcher.

(Footnotes omitted.) Frank C. Ingraham, Note, *Heir Hunting—A Profession or a Racket?*, 7 Vand. L. Rev. 104, 104 (1953-1954). Heir hunters also seek out the rightful owners or heirs of abandoned property. Allan Friedman, Note, *Heir-Hunting Agreements: Recommendations for the Extension of Probate Court Jurisdiction*, 6-7 Conn. Prob. L.J. 87, 92 (1991-1993). Heir hunters may be solicited, for example, hired by an administrator. Others, however, may be "uninvited" or "unsolicited". Friedman, at 87-88.

Historically, agreements of the sort at issue here were regarded with disfavor, and courts often refused to enforce them. R.P. Davis, Annotation, *Heir Hunting*, 171 A.L.R. 351, 351 (1947). Some states' courts still disfavor such agreements. In jurisdictions where common-law champerty and maintenance are recognized, agreements providing for a fee only when the heir receives the inheritance with the heir hunter paying all expenses, such as attorney fees and court costs, have been invalidated as involving champerty. *See, e.g., In re Estate of Rice*, 24 Ohio Op. 2d 379, 193 N.E.2d 566 (P. Ct.1963).

Heir hunter agreements have also been invalidated as the unauthorized practice of law. *See, e.g., In re Estate of Butler*, 29 Cal. 2d 644, 647, 177 P.2d 16, 18, 171 A.L.R. 343

(1947); *In re Estate of Rice, supra; Carey v. Thieme*, 2 N.J. Super. 458, 64 A.2d 394 (1949) (where power of attorney obtained from beneficiary by nonlawyer heir hunter, heir hunter engaged in unlawful practice of law against public policy). One author notes that "professional heir hunters have learned to conceal these illegal practices by omitting reference to their control of the heir's claim" and adding that "[t]he courts have not been misled very often by this subterfuge, but have also looked to other facts, such as the oral agreements and superior knowledge, to find any intended control of litigation". Ingraham, at 107.

In contrast, some courts have upheld heir hunter agreements even where a high percentage fee is contracted for. *E.g., In re Estate of Katze-Miller*, 158 Wis. 2d 559, 463 N.W.2d 853 (Ct. App. 1990) (agreement with 40 percent fee upheld).

In many states, the practice is allowed, but regulated by statute or common law. In New York and California, probate courts have statutory authority to approve or disapprove heir hunter agreements, and have the authority to adjust fees charged. N.Y. Est. Powers & Trusts Law § 13-2.3 (McKinney Supp. 1995) (court may fix and determine the validity and reasonableness of the compensation whether or not it is fixed by the agreement); Cal. Prob. Code § 11604 (West 1991) (providing in part for distribution of assigned property on any terms which are just and equitable if the fee agreed to is grossly unreasonable, or the agreement was obtained by duress, fraud or undue influence); *see, e.g., In re Estate of Devlin*, 182 A.D.2d 322, 588 N.Y.S.2d 316 (1992) (surrogate properly exercised authority to reduce heir hunter firm's fee from 40 percent to 15 percent). *See* Friedman, at 101-07.

A number of states have adopted the Uniform Unclaimed Property Act of 1981, which provides that such agreements concerning property covered by escheat statutes are unenforceable if made within 24 months after the property is paid or delivered to the appropriate state entity. *See* Unif. Unclaimed Property Act § 35, 8B U.L.A.

680 (1993). Washington's variation of the model act provision, RCW 63.29.350, will be discussed below.

In this case, McGoldrick has argued that the agreement is unconscionable, illegal, and against public policy, and is therefore unenforceable as a matter of law.

The existence of an unconscionable bargain is a question of law for the courts. *Mieske v. Bartell Co.*, 92 Wn.2d 40, 50, 593 P.2d 1308, 6 A.L.R.4th 923 (1979). In *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 544 P.2d 20 (1975), we observed that it "is extremely difficult to articulate an operational definition of unconscionability . . .". *Schroeder*, at 259. Two classifications of unconscionability have generally been recognized: (1) substantive unconscionability, involving "those cases where a clause or term in the contract is alleged to be one-sided or overly harsh"; and (2) procedural unconscionability, relating "to impropriety during the process of forming a contract". *Schroeder*, at 260. McGoldrick claims the contract is both procedurally and substantively unconscionable.

"Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh . . .". *Schroeder*, at 260. "Shocking to the conscience", "monstrously harsh", and "exceedingly calloused" are terms sometimes used to define substantive unconscionability. *Montgomery Ward & Co. v. Annuity Bd. of S. Baptist Convention*, 16 Wn. App. 439, 444, 556 P.2d 552 (1976). Procedural unconscionability has been described as the lack of a meaningful choice, considering all the circumstances surrounding the transaction including " '[t]he manner in which the contract was entered,' whether each party had 'a reasonable opportunity to understand the terms of the contract,' and whether 'the important terms [were] hidden in a maze of fine print. . . .' ". *Schroeder*, at 260 (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449, 18 A.L.R.3d 1297 (D.C. Cir. 1965)). It is important, however, that these three factors not be applied mechanically without regard to whether in truth a meaningful choice existed.

In a few cases involving consumer purchases, courts have held that gross excessiveness of price rendered contracts unconscionable. *E.g., American Home Improvement, Inc. v. MacIver*, 105 N.H. 435, 201 A.2d 886, 14 A.L.R.3d 324 (1964); *Central Budget Corp. v. Sanchez*, 53 Misc. 2d 620, 279 N.Y.S.2d 391 (Civ. Ct. 1967). McGoldrick claims that the fee in this case is exorbitant, and that the trial court properly granted summary judgment on the issue of unconscionability.

Relying upon *Schroeder*, Nelson contends that regardless of the circumstances presented in a given case, summary judgment is never appropriate where unconscionability is claimed. In *Schroeder*, at 262, the court quoted RCW 62A.2-302, the Uniform Commercial Code unconscionability provision, which requires that the parties be afforded a reasonable opportunity to present evidence of an agreement's commercial setting, purpose, and effect to assist the court in deciding whether the agreement is unconscionable. The court in *Schroeder* then said "[i]n accordance with the requisites set forth above, a court is not authorized to dispose of this issue under the rules governing summary judgment". *Schroeder*, at 262. Instead, the statute envisions a "full hearing". *Schroeder*, at 262.

Neither *Schroeder* nor RCW 62A.2-302 directly applies in this case, because this case is not governed by the U.C.C. Moreover, the apparent prohibition in *Schroeder* against summary judgment proceedings where unconscionability is claimed is not universally accepted. It is true that some courts have followed the rule stated in *Schroeder*. *E.g., Food Assocs., Inc. v. Capital Assocs., Inc.*, 491 So. 2d 345, 346 (Fla. Dist. Ct. App. 1986); *Haugen v. Ford Motor Co.*, 219 N.W.2d 462, 468 (N.D. 1974). Others, however, have concluded that under the U.C.C. unconscionability may be decided on summary judgment. *E.g., Earl M. Jorgensen Co. v. Mark Constr., Inc.*, 56 Haw. 466, 473, 540 P.2d 978 (1975) (a hearing on a motion for summary judgment may provide "a reasonable opportunity to present evidence" within the meaning of the statute, and if there are no ma-

terial facts in dispute, the issue of unconscionability is no bar to grant of summary judgment); *Blalock Mach. & Equip. Co. v. Iowa Mfg. Co.*, 576 F. Supp. 774, 778 (N.D. Ga. 1983); *see also* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 4-3, at 202 n.7 (3d ed. 1988) (motion for summary judgment may provide sufficient opportunity for required hearing).

A number of courts have adopted an approach which recognizes both the propriety of summary judgment and the U.C.C.'s position that the parties must be afforded a full opportunity to present their evidence. These courts have concluded that the determination of unconscionability is a question properly before the court on a motion for summary judgment, with a factual hearing mandatory only where the court accepts the possibility of unconscionability. Conversely, if there is no basis for such a possibility, no hearing is required. *See, e.g., Fleischmann Distilling Corp. v. Distillers Co.*, 395 F. Supp. 221, 234 n.18 (S.D.N.Y. 1975); *Beckman v. Vassall-Dillworth Lincoln-Mercury, Inc.*, 321 Pa. Super. 428, 436-37, 468 A.2d 784 (1983). The Court of Appeals has applied a similar analysis. *See Jeffery v. Weintraub*, 32 Wn. App. 536, 542-43, 648 P.2d 914 (1982) (absent a threshold showing of unconscionability sufficient to survive summary judgment, issue disappears from the case). *Cf. Yakima County (W. Valley) Fire Protection Dist. No. 12 v. Yakima*, 122 Wn.2d 371, 391-93, 858 P.2d 245 (1993) (summary judgment properly granted; no unconscionability as a matter of law).

■ ■ We conclude that summary judgment may, under some circumstances, be appropriately granted to a plaintiff even in the face of a claim that a contract is unconscionable. We need not decide, however, the question whether summary judgment could properly be granted to a defendant where the record at the summary judgment proceeding, unlike in *Schroeder*, is fully developed on the defense of unconscionability. Those are not the circumstances in this case. As explained below, the evidence here raises the possibility of an unconscionable contract, but is

insufficient to resolve the question of unconscionability as a matter of law. For example, the limited record before us does not reveal what efforts or time were required to locate McGoldrick, yet this is a consideration in determining whether a 50 percent fee was unconscionable here. The only evidence directly concerning the efforts to locate McGoldrick is that Nelson's assistant noticed the advertisement placed by Panorama, that the assistant made several calls to Panorama, that the assistant tracked McGoldrick to Tacoma, that once she was tracked to Tacoma, Nelson thought he found her through old directories, and that it took a few weeks to locate her.

In *In re Estate of Katze-Miller, supra,* where the court enforced this type of agreement, the court noted, among other things, that the evidence substantiated that the heir-hunting firm performed detailed work involving many support personnel to establish the heirs' entitlement to the estate, and to exclude the possibility of other heirs. The court rejected the argument that the heir-hunter agreement, with its 40 percent fee, was unconscionable. The evidence referred to in *Katze-Miller* is the kind of evidence which is missing in the present case.

Nor is there sufficient evidence as to what constitutes a fair, reasonable and customary fee in the heir-hunting business which might shed light on whether the 50 percent fee is shocking to the conscience. In *Pelton v. Witcher,* 319 S.W.2d 400, 403 (Tex. Civ. App. 1958), the court rejected a claim of unconscionability of an heir hunter agreement providing for a 50 percent fee. In that case there was testimony that this was the fair, reasonable and customary compensation, with no other testimony on the point. The court concluded the evidence was insufficient to support the finding that the contract was unconscionable.

Also unknown is the likelihood that McGoldrick could have successfully learned of or located the property on her own. In *In re Estate of Croake,* 218 Ill. App. 3d 124, 578 N.E.2d 567, *appeal denied,* 584 N.E.2d 128 (1991), for example, in the face of an unconscionability claim the

court observed that the heir was given the decedent's name before signing an authorization form for legal representation required by the heir-hunter agreement, and could have inquired of relatives as to family death. Although the Court of Appeals here reasoned that McGoldrick could have sought to locate the property on her own, there is no basis in the record for determining whether that was a viable option. McGoldrick's first husband had died some 16 years before Nelson approached her, and it is simply unknown whether she had any other meaningful option for obtaining the Panorama information.

Nelson's service was valuable if, but for his efforts, McGoldrick would not have learned of the property. For instance, an heir hunter may literally race to obtain an assignment of property in advance of other efforts, perhaps by an estate administrator, which likely would have been successful. Along these lines, some courts have reasoned that the heir must truly be missing, and that consideration is lacking unless it is likely that the heir would not otherwise be located. Also, where a reasonable time lapse for locating the heir has not occurred, valuable consideration has been held lacking. *See* Ingraham, 7 Vand. L. Rev. at 108 (and cases cited therein). Here, less than a month passed between Panorama's advertisement and the signing of the agreement. Whether or not Panorama had made, or would make, any other efforts to locate McGoldrick cannot be determined from the materials before us.

Finally, when Nelson set the take-it-or-leave-it fee, he knew what efforts had been made and he had the information from which to deduce whether McGoldrick was in fact entitled to the property. There were no unknown risks. In contrast, by Nelson's own admission McGoldrick was kept uninformed about those efforts to ensure Nelson would not be "beaten on his fee". Clerk's Papers, at 55. While parties must be given wide latitude to contract, even if a decidedly one-sided agreement results, McGoldrick did not have any way to know whether she was signing an unfairly harsh agreement.

Other considerations include the fact that both McGoldrick's husband and stepson, an attorney, were present when the agreement was signed. The agreement is short, not especially complex, and contains no hidden terms in fine print. There is no indication in the record that McGoldrick lacked adequate time to study and understand the agreement, and there is no indication that she in fact did not understand the contract language.

Finally, the Court of Appeals said that the only conduct which may have placed some pressure on McGoldrick to sign is that Nelson told her he would not meet with her again. However, we note an additional pressure because Nelson refused to disclose much about the property or his efforts to locate McGoldrick.

Although the evidence submitted by McGoldrick on the motion for summary judgment raises the possibility that this heir hunter agreement is unconscionable, it is insufficient to decide the issue. We therefore remand for a hearing on the question whether this contract is unconscionable. The factors discussed above may be relevant to resolution of the question, but are not exhaustive. All of the circumstances of the transaction should be considered.

If, after a full hearing on this matter, the trial court again concludes that the agreement is unconscionable, the contract will not be specifically enforced.[1]

Turning to the remaining contract issues, we agree with the Court of Appeals that the agreement is not illegal nor has McGoldrick convinced us that it should be declared void as against public policy.

McGoldrick first argues that the contract with its "exorbitant" fee constitutes second-degree extortion. The courts will leave the parties "where it finds them" when the contract is illegal or when "the contract grows im-

---

[1] In that event, however, we direct the trial court's attention to RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. g (1981), which explains that where the parties cannot be restored to their pre-contract positions, "the offending party will ordinarily be awarded at least the reasonable value of performance rendered by him".

mediately out of and is connected with an illegal act". *Golberg v. Sanglier*, 96 Wn.2d 874, 879, 639 P.2d 1347, *amended*, 647 P.2d 489 (1982).

RCW 9A.56.110 defines extortion: " 'Extortion' means knowingly to obtain or attempt to obtain by threat property or services of the owner, as defined in RCW 9A.56.010(8). . .". Second-degree extortion is committed if extortion is committed by means of a threat as defined in RCW 9A.04.110(25)(d)-(j). RCW 9A.04.110(25)(g), upon which McGoldrick relies, defines "threat" as follows: " 'Threat' means to communicate, directly or indirectly the intent. . . [t]o testify or provide information or withhold testimony or information with respect to another's legal claim or defense. . .".

The Court of Appeals reasoned that the parties' contract negotiations did not constitute extortion. The court said that in contract negotiations, neither party is obligated to provide any information to the other party, nor is either party obligated to enter the contract at all.

Although we agree, for the most part, with the Court of Appeals' resolution of this issue, as Judge Alexander observed in his dissent, criminal extortion is not less a crime just because a fee is negotiated and set forth in a contract. In two cases where parties tried to obtain money in exchange for information about stolen property, the fact that a contract was involved did not preclude a determination that extortion was committed under statutes like Washington's. *Stamatiou v. United States Gypsum Co.*, 400 F. Supp. 431 (N.D. Ill. 1975), *aff'd*, 534 F.2d 330 (7th Cir. 1976); *Blackwood v. State*, 157 Ind. App. 286, 299 N.E.2d 622 (1973).

■ The distinction between the present case and *Stamatiou* and *Blackwood* is that here the property was not stolen, but unclaimed (with McGoldrick's legal entitlement still to be finally determined), and the agreement was not merely an exchange of information for a share of the property, but instead involved Nelson's services in locating the property, locating McGoldrick, and then as-

sisting her so that her claim to the property could come to fruition. The agreement here does not, therefore, violate the extortion statutes.

McGoldrick also claims that the contract violates RCW 63.29.350, a provision in the Uniform Unclaimed Property Act. (RCW 63.29.350 is not, however, the model act provision.)

"Contractual provisions which conflict with the terms of a legislative enactment are illegal and unenforceable." *Machen, Inc. v. Aircraft Design, Inc.*, 65 Wn. App. 319, 333, 828 P.2d 73 (citing *Hederman v. George*, 35 Wn.2d 357, 212 P.2d 841 (1949)), *review denied*, 120 Wn.2d 1007 (1992).

The statute provides:

It is unlawful for any person to seek or receive from any person or contract with any person for any fee or compensation for locating or purporting to locate any property which he knows has been reported or paid or delivered to the department of revenue pursuant to this chapter in excess of five percent of the value thereof returned to such owner. Any person violating this section is guilty of a misdemeanor and shall be fined not less than the amount of the fee or charge he has sought or received or contracted for, and not more than ten times such amount, or imprisoned for not more than thirty days, or both.

RCW 63.29.350.

McGoldrick has not established that the property at issue was reported or paid or delivered to the Department of Revenue, and it appears from the record that the property was in Panorama's control throughout the relevant time. The statute does not apply here.

McGoldrick also argues that the contract is void as against public policy. She first argues that the contract violates the policy declared in RCW 63.29.350, quoted above, even if the statute does not directly control. The Court of Appeals disagreed, reasoning that the statute does not establish a public policy against high fees in all cases. Some support for the Court of Appeals' position is found in *International Tracers of Am. v. Estate of Hard*,

89 Wn.2d 140, 570 P.2d 131 (1977), *appeal dismissed,* 435 U.S. 1004 (1978), where this court upheld the constitutionality of RCW 63.29.350. The court noted that the statute was carefully confined to apply only in the case of fees for locating or purporting to locate property known to have been reported, paid, or delivered to the Department of Revenue. *International Tracers,* at 148. Although the court was not addressing the question now before us, this comment indicates a narrow application of the statute and its policy. *But see Landi v. Arkules,* 172 Ariz. 126, 835 P.2d 458 (Ct. App. 1992) (heir hunter agreement for 40 percent fee against public policy declared in Arizona's statute concerning escheated property and limiting fees to 30 percent).

We agree with the Court of Appeals that RCW 63.29.350 does not establish public policy requiring invalidation of the parties' agreement. By its terms it applies only to property reported, paid or delivered to the Department of Revenue. We are unable to discern legislative intent that this policy should extend beyond the statute's terms. Moreover, we are not inclined to invalidate all such agreements involving fees over 5 percent on property not falling within the terms of the statute, because in some cases heir hunters may provide the only means by which those entitled to unclaimed property might learn of their entitlement.

McGoldrick also maintains that a contract may be declared void as against public policy where it has a tendency to evil, is against the public good, or is injurious to the public. *See Marshall v. Higginson,* 62 Wn. App. 212, 216, 813 P.2d 1275 (1991), *review dismissed,* 119 Wn.2d 1013 (1992). Again, however, we note that such agreements may be beneficial rather than harmful in some cases. It is possible, of course, that the elderly, the mentally incapacitated, or those in financial need, among others, could be prey to unscrupulous heir hunter agreements demanding unwarranted high fees, but existing contract doctrines may be invoked in such cases.

We conclude that McGoldrick has failed to establish that the agreement should be declared void as against public policy.

■ Other issues, raised by Nelson, will not be considered because the record does not establish that they were ever raised at the trial level and considered by the trial court in ruling on the motion for summary judgment. RAP 9.12; *see Washington Fed'n of State Employees, Council 28 v. Office of Fin. Management*, 121 Wn.2d 152, 157, 849 P.2d 1201 (1993) (purpose of the limitation in RAP 9.12 is to effectuate the rule that appellate court engages in the same inquiry as the trial court on review of summary judgment); *see also Haueter v. Cowles Publishing Co.*, 61 Wn. App. 572, 590, 811 P.2d 231 (1991) ("[a]n issue not raised in a summary judgment proceeding should not be considered on review"). These issues involve theories of unjust enrichment and quantum meruit, and allegations of theft on the part of McGoldrick and her stepson.

Nelson also seeks attorney fees "on appeal" pursuant to RCW 4.84.330. It is not clear whether he asks for fees for the appeal, this discretionary review, or both. The statute permits an award of such fees in an action on a lease or contract where the lease or contract specifically provides for attorney fees and costs. Since the agreement here does not contain such a provision, the statute does not authorize an award. Nelson seems to believe the statute authorizes an attorney fee award where equity is involved. It does not. However, attorney fees may be awarded on a recognized ground of equity. *Pennsylvania Life Ins. Co. v. Employment Sec. Dep't,* 97 Wn.2d 412, 413, 645 P.2d 693 (1982). Nelson claims that under his theories of unjust enrichment and quantum meruit, there is an equity ground for an award of attorney fees, but cites no authority in support of this particular contention. In any event, this argument lacks merit because, as noted, these theories are not properly before this court and will not be reviewed. RAP 9.12. The request for attorney fees is denied.

Finally, McGoldrick has moved to strike all or some portions of the Supplemental Brief of Respondent on the basis it refers to evidence not supported by the record. The supplemental brief, which is barely over nine pages long, contains numerous factual assertions unsupported by the record, and evidence (including one-and-a-half pages of deposition testimony) which was never submitted to nor considered by the trial court in deciding the summary judgment motion. We grant the motion to strike those portions of the brief containing the factual material about which McGoldrick appropriately complains. *See State v. Krall*, 125 Wn.2d 146, 149, 881 P.2d 1040 (1994); *State v. Skiggn*, 58 Wn. App. 831, 839, 795 P.2d 169 (1990).

The Court of Appeals' holding that the contract is not unconscionable is reversed and this matter is remanded for proceedings consistent with this opinion.

DOLLIVER, SMITH, GUY, and TALMADGE, JJ., and UTTER, J. Pro Tem., concur.

DURHAM, C.J., concurs in the result.