183 P.3d 359 (2008)
Elizabeth A. OLSON, individually and on behalf of others similarly situated; Kenneth L. Peterson, individually and on behalf of others similarly situated; and Jeannette C. Colyear, individually and on behalf of others similarly situated, Respondents,
v.
THE BON, INC., an Ohio corporation; Facs Group, Inc., an Ohio corporation; John Does A-S, Defendants,
Trilegiant Corporation, a Delaware corporation, Appellant.
No. 24343-5-III.
Court of Appeals of Washington, Division 3.
May 20, 2008.
*361 Kent Michael Fandel, Graham & Dunn PC, Seattle, WA, Kenneth Kliebard, Todd McLawhorn, Kenneth Kliebard Howrey, LLP, Chicago, IL, for Appellant.
Darrell W. Scott, The Scott Law Group PS, Bryce James Wilcox, Attorney at Law, Spokane, WA, for Respondents.
KULIK, J.
¶ 1 Plaintiffs, Elizabeth Olson and others, were credit card customers with The Bon Marche department store (The Bon). The Bon offered its credit card customers the option to enroll in a credit protection program offered by Trilegiant Corporation (Trilegiant). The offer included a three-month free trial membership and cash back benefits which could be accepted by endorsing and negotiating a "check" for $2.50. Clerk's Papers (CP) at 12. Once the check was cashed, if the customer did not cancel before the trial period ended, membership was automatically renewed for a year for a specified annual charge.
¶ 2 After Plaintiffs enrolled in the trial membership program, Trilegiant allegedly mailed a "fulfillment kit" which included a provision requiring arbitration of any and all disputes. CP at 200. Plaintiffs denied receiving the kits. Plaintiffs did not cancel their membership and were charged the annual fee.
¶ 3 Plaintiffs filed a class action lawsuit against Trilegiant alleging that they were fraudulently induced into entering into the agreements and that they were wrongly billed for the credit protection program. Trilegiant moved to compel arbitration. Plaintiffs opposed the motion asserting (1) that they had not received the fulfillment kits containing the arbitration clause and, therefore, had not agreed to arbitration and (2) that the arbitration clauses were procedurally and substantively unconscionable. The trial court denied Trilegiant's motion to compel arbitration and Trilegiant appeals. We affirm.

FACTS
¶ 4 Trilegiant is a Delaware corporation that, among other services, provides a membership and credit card protection service called the Hot-Line program which, in part, assists members in the event of loss, theft, or fraudulent use of their credit cards. Trilegiant has provided memberships to millions of consumers across the United States.
¶ 5 The Bon is a retail department store and an Ohio corporation. It offers an in-house credit card through FACS Group, Inc. (FACS), a separate subsidiary of its parent company Federated Department Stores. The Bon offered Trilegiant's Hot-Line program to some of its credit card customers, including Elizabeth Olson, Kenneth Peterson and Jeannette C. Colyear[1] (collectively known as Plaintiffs).
¶ 6 In December 2003, Plaintiffs received a solicitation from Trilegiant in connection with their Bon credit card accounts. The membership enrollment solicitation letter informed the Plaintiffs of the benefits, terms, cost and method of enrolling in a Hot-Line membership program. The prominent inducement in the solicitation letter as shown by the subject line is the prospect of earning cash back on purchases at The Bon. The letter, however, also informed the recipient of the credit protection aspect of membership in the program.
¶ 7 The solicitation letter also contained an enrollment check, payable to the recipient of the letter, in the amount of $2.50. By endorsing and cashing the check, interested members agreed to enroll in a free, three-month trial membership in the Hot-Line program. Plaintiffs responded to the solicitation by endorsing and negotiating the check.[2]
¶ 8 The solicitation agreement provided that members could cancel at any time during the three-month trial period without *362 charge. If, at the end of the three-month trial period, the member did not notify Trilegiant of his/her intent to discontinue membership, Trilegiant would automatically extend the membership on an annual basis. At that point, members would be charged an annual fee of $69.99 for continued membership. Each year thereafter, membership would automatically be renewed at the current rate unless Trilegiant was notified of cancellation. Members were entitled to cancel membership at any time and receive a full refund of that year's membership fees.
¶ 9 After a member is enrolled in the Hot-Line program, Trilegiant's practice is to mail the member a fulfillment kit further explaining the Hot-Line program and further elaborating on the terms and conditions of the program. The fulfillment kit contained a mandatory arbitration provision. Trilegiant contracted with a vendor, Jetson Direct Mail Service's, Inc. (Jetson), to mail the fulfillment kits to enrolled members.
¶ 10 The Plaintiffs filed a class action complaint in Spokane County Superior Court against The Bon, FACS, and Trilegiant claiming that the defendants had fraudulently induced them into enrolling in the credit card protection program and improperly charged their credit card for that program.
¶ 11 In December of 2004, Trilegiant filed a motion to compel arbitration and stay proceedings based upon the mandatory arbitration clause contained in the fulfillment kit.[3] Plaintiffs opposed the motion arguing, in part, that they had never received the fulfillment kits containing the mandatory arbitration provisions; that Trilegiant had failed in its burden of proof since it could not specify which arbitration clause was included in the fulfillment kits; that they had been deceived into enrolling in the program; and that the arbitration clauses were substantively and procedurally unconscionable. Trilegiant replied detailing their custom and practices with regard to mailing the fulfillment kits and invoking the mailbox rule's rebuttable presumption which they contended the Plaintiffs had failed to rebut. Trilegiant further argued that the parties had agreed to arbitrate and stipulated that it would be bound under either of the two agreements. Trilegiant further argued that the Plaintiffs' fraudulent inducement arguments were insufficient to avoid arbitration and that the arbitration agreements were not procedurally or substantively unconscionable.
¶ 12 On April 22, 2005, the trial court held a hearing on the motion to compel. At the conclusion of the hearing, the lower court orally ruled from the bench and denied Trilegiant's motion. The court based its decision principally on the belief that Trilegiant had not proved that it mailed an arbitration agreement to the named Plaintiffs and that neither of the arbitration clauses was enforceable. The court declined to rule on the Plaintiffs' fraudulent inducement argument. Trilegiant appeals.

ANALYSIS
¶ 13 The issue presented here is whether the trial court erred in denying Trilegiant's motion to compel arbitration. We review trial court decisions on motions to compel arbitration de novo. Zuver v. Airtouch Commc'ns, Inc., 153 Wash.2d 293, 302, 103 P.3d 753 (2004) (citing Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931, 936 (9th Cir.2001)).
¶ 14 Trilegiant first argues that the trial court erred in ruling that it had failed in its burden of proving that the arbitration clauses contained in its fulfillment kits became a part of the contract between the parties.
¶ 15 The duty to arbitrate arises from a contractual relationship. Mutual assent of the parties is an essential element of a valid contract. Yakima County (West Valley) Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wash.2d 371, 388, 858 P.2d 245 (1993). Washington courts follow the objective manifestation theory by which the court will impute to a person an intention corresponding to the reasonable meaning of his words and acts. Morris v. Maks, 69 Wash. App. 865, 871, 850 P.2d 1357 (1993). Under *363 this theory, the unexpressed, subjective intentions of the parties are irrelevant. Instead, the mutual assent of the parties is to be determined from their outward manifestations. Saluteen-Maschersky v. Countrywide Funding Corp., 105 Wash.App. 846, 854, 22 P.3d 804 (2001) (citing City of Everett v. Estate of Sumstad, 95 Wash.2d 853, 855, 631 P.2d 366 (1981)).
¶ 16 Here, the trial court concluded that Trilegiant had failed to meet its burden of proving that the fulfillment kits were mailed to or received by the Plaintiffs. Trilegiant, relying on the mailbox rule, argues that the trial court's ruling was in error.
¶ 17 The mailbox rule provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time. Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956 (9th Cir.2001); Lewis v. United States, 144 F.3d 1220, 1222 (9th Cir.1998). The presumption of receipt permitted under the common law mailbox rule is not invoked lightly. See Sorrentino v. Internal Revenue Serv., 383 F.3d 1187, 1191 (10th Cir.2004) (applying a strict standard of proof before invoking a presumption of receipt). It requires proof of mailing, such as an independent proof of a postmark, a dated receipt, or evidence of mailing apart from a party's own self-serving testimony. Id. at 1195 (invoking the mailbox rule's presumption of receipt requires independent proof of a postmark or evidence other than the taxpayer's self-serving testimony as to actual mailing). The independent proof may also be in the form of business records establishing the mailing, evidence of a course of business regarding mailing, or third party testimony witnessing the mailing. See Knickerbocker Life Ins. Co. v. Pendleton, 115 U.S. 339, 347, 6 S.Ct. 74, 29 L.Ed. 432 (1885) (adopting the rule that "allows usage and the course of business to be shown for the purpose of raising a prima facie presumption of fact in aid of collateral testimony"); Anderson v. United States, 966 F.2d 487, 491 (9th Cir.1992) (allowing extrinsic evidence of taxpayer's testimony that she watched the postal clerk stamp her document and affidavit of friend accompanying her to the post office to provide proof of postmark to show a timely mailing); Vill. of Kiryas Joel Local Dev. Corp. v. Ins. Co. of N. Am., 996 F.2d 1390, 1394 (2d Cir.1993) (finding sufficient to create presumption of receipt an employee's statement of customary office procedure plus record indicating that employee mailed letter); Myers v. Moore-Kile, Co., 279 F. 233, 235 (5th Cir.1922) (using evidence that a document was mailed in the regular course of business as proof that it was actually mailed). When an office handles such a large volume of business that no one could be expected to remember any particular notice or letter, proof of mailing may be made by showing (a) an office custom with respect to mailing and (b) compliance with the custom in the specific instance. Farrow v. Dep't of Labor & Indus., 179 Wash. 453, 455, 38 P.2d 240 (1934).
¶ 18 Here, Trilegiant presented evidence that, after a member has enrolled in the Hot-Line program, Trilegiant's practice is to mail the member a "fulfillment kit" further explaining the Hot-Line program and further elaborating on the terms and conditions of the program. One of the terms and conditions contained in the fulfillment kit is a mandatory arbitration provision. Trilegiant contracted with lettershop vendor, Jetson, to mail the fulfillment kits to enrolled members.
¶ 19 Jetson submitted an affidavit explaining its customary practice and procedures with respect to mailing the fulfillment kits for Trilegiant. Jetson's affidavit explained that it was Jetson's routine practice to mail the fulfillment kits to 100 percent of the names provided by Trilegiant; that Jetson routinely undertook a variety of quality assurance measures to ensure the fulfillment kits were mailed to 100 percent of the customer names within the contractually specified time period; and that Jetson was required to notify Trilegiant of any variances or discrepancies in the mailing. In addition, Jetson confirmed that, after viewing its records, there was no record of any breakdown or material errors in the mailing process or procedures during January, February or March 2003 which would have resulted in a failure to mail any of the Hot-Line fulfillment kits.
*364 ¶ 20 However, even assuming all the above facts are true, there is still insufficient evidence by which to find the mailbox rule has been satisfied. Notably absent is any statement or proof that Trilegiant forwarded the names and addresses of the Plaintiffs to Jetson for purposes of mailing the fulfillment kits to them. While Trilegiant asserts that they have a practice of sending the names and addresses of new enrollees to Jetson and that Jetson has a practice and procedure in place to confirm the names and addresses sent, Trilegiant presented no evidence of any custom or procedure on how these names and/or addresses are compiled; whether they are submitted to Jetson on a daily, weekly or monthly schedule; or whether there is any procedure or safeguard in place for Jetson or Trilegiant to discover any problem if the names were inadvertently not forwarded to Jetson. These problems, combined with the Plaintiffs assertions that they did not receive the fulfillment kits and Trilegiant's admission that it cannot prove which fulfillment kit was actually sent to Plaintiffs, negate any finding of mutual assent. The trial court's ruling on this issue was not in error.
¶ 21 Even if Trilegiant could prove that Plaintiffs were mailed a fulfillment kit, its argument would still fail because at least one of the two possible arbitration clauses allegedly mailed to the Plaintiffs is substantively unconscionable. "The existence of an unconscionable bargain is a question of law for the courts." Nelson v. McGoldrick, 127 Wash.2d 124, 131, 896 P.2d 1258 (1995) (citing Mieske v. Bartell Drug Co., 92 Wash.2d 40, 50, 593 P.2d 1308 (1979)). To determine whether the arbitration agreements in this case are substantively unconscionable, we look to see if the agreement is "one-sided," "overly harsh," "shocking to the conscience," or "exceedingly calloused." See Nelson, 127 Wash.2d at 131, 896 P.2d 1258.
¶ 22 One of the arbitration clauses Trilegiant admits may have been mailed to the Plaintiffs provides as follows:
4. GOVERNING LAW; ARBITRATION  This Agreement, and the respective rights and obligations of the parties hereunder, shall be governed by, and construed in accordance with, the laws of the State of Connecticut. If there is a dispute between you and Trilegiant, either of us may elect to have it resolved by proceeding in small claims court or by final and binding arbitration administered by the National Arbitration Forum, or the American Arbitration Association, under their rules for consumer arbitration. All disputes in arbitration will be handled just between the named parties and not on any representative or class basis. YOU CAN ACKNOWLEDGE THAT THIS MEANS THAT YOU MAY NOT HAVE ACCESS TO A COURT OR JURY. The terms of this Section shall survive any termination, cancellation, or expiration of this Agreement.
CP at 695.
¶ 23 This provision incorporates an unconscionable class action waiver that effectively exculpates Trilegiant from liability for a large class of wrongful conduct. See Scott v. Cingular Wireless, 160 Wash.2d 843, 161 P.3d 1000 (2007). Like the class action waiver in Scott, this provision, on its face, does not exculpate Trilegiant from anything; it merely channels dispute resolution into individual arbitration proceedings or small claims court. But in effect, this exculpates Trilegiant from legal liability for any wrong where the cost of pursuit outweighs the potential amount of recovery. As the Washington Supreme Court noted in Scott, "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." Scott, 160 Wash.2d at 855, 161 P.3d 1000 (quoting Judge Posner in Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004)).
¶ 24 In cases such as this where the damages suffered is minimal, the ability to proceed as a class transforms a merely theoretically possible remedy into a real one. Id. "[Class actions are] often the only meaningful type of redress available for small but widespread injuries. Without it, many consumers may not even realize that they have a claim. The class action provides a mechanism to alert them to this fact." Id. at 855, 161 P.3d 1000 (internal citations omitted). Thus, removing the option of pursuing a class *365 action under these facts practically exculpates Trilegiant from any alleged wrongdoing.
¶ 25 Trilegiant contends, however, that it has cured any concerns about access to a remedy by stipulating to "pay all administrative costs and arbitrator fees associated with an individual (non-class) arbitration of each of the three Plaintiffs" and participating in arbitration at a "location within Washington of each plaintiff's choosing." CP at 34 (Trilegiant Corporation's memorandum of law in support of its motion to compel arbitration and stay proceedings, at 7 n. 1). While laudable, it appears to us that these provisions do not ensure that a remedy is practically available. As the court noted in Scott "claims as small as those in this case are impracticable to pursue on an individual basis even in small claims court, and particularly in arbitration. Shifting the cost of arbitration . . . does not seem likely to make it worth the time, energy, and stress to pursue such individually small claims." Id. at 855-56, 161 P.3d 1000. Additionally, Trilegiant's stipulations ignore the other potential class members who have not been offered this remedy and who may be dissuaded from pursuing a remedy as a result.
¶ 26 Like the arbitration clause in Scott, "this clause bars any class action, in arbitration or without, it functions to exculpate the drafter from liability for a broad range of undefined wrongful conduct, including potentially intentional wrongful conduct," and is, therefore, "substantively unconscionable." Cf. Scott, 160 Wash.2d at 857, 161 P.3d 1000, and Luna v. Household Fin. Corp. III, 236 F.Supp.2d 1166, 1177-79 (W.D.Wash.2002) (finding under Washington law that class action waiver in an arbitration rider was substantively unconscionable). And, because any dispute in this case  on the individual consumer level  involves less than a couple of hundred dollars, the prohibition against class actions effectively precludes individual claimants from ever challenging practices applicable to all potential class members. As a result, this clause falls squarely within the guideline of Scott and is unconscionable and unenforceable.
¶ 27 Trilegiant has also offered to arbitrate under either provision should one be found unenforceable. That offer, however, does not change the outcome here. For a contract to exist, there must be a mutual intention or "meeting of the minds" on the essential terms of the agreement. Saluteen-Maschersky, 105 Wash.App. at 851, 22 P.3d 804 (quoting McEachren v. Sherwood & Roberts, Inc., 36 Wash.App. 576, 579, 675 P.2d 1266 (1984)). Here, even assuming the Plaintiffs received a fulfillment kit containing one of the arbitration clauses, there is no evidence that the Plaintiffs consented to be bound by an enforceable agreement to arbitrate and we cannot and should not force one upon them.
¶ 28 We affirm the trial court's denial of Trilegiant's motion to compel arbitration.
WE CONCUR: SCHULTHEIS, C.J., and SWEENEY, J.
NOTES
[1] Plaintiff Jeannette Colyer was mistakenly referred to as "Colyear" in the Amended Complaint.
[2] Plaintiffs originally denied negotiating the checks. However, they later acknowledged that the signatures on the checks appeared to be theirs, although each denied recollection of endorsing the checks.
[3] During the time period when these fulfillment kits were to be mailed, there were two different kits containing two different arbitration clauses. Trilegiant was unable to determine which fulfillment kit was mailed to each of the plaintiffs.